## DEAN vs. CHARLTON, Treasurer, etc., and others

*Power of city to contract for patented pavement, at expense of lot owners.— Conditions of equitable relief.— Re-assessment of void taxes.*

1. Where a city was empowered by its charter to improve streets at the expense of adjoining lot owners, but required to let all such work to the lowest bidder, it could not contract for laying a pavement at the expense of such lot owners, the right to lay which was *patented*, and owned by one firm.

2. The fact that such right for said locality was freely offered for sale, would not secure the required freedom of competition.

3. *Quære*, whether such a contract might not be upheld, if it appeared (1) that there was a previous arrangement between the city and the owners

of the patent binding the latter to sell the right for said locality at a fixed price to whoever might obtain the contract; (2) that such price was trifling compared with that of the labor and materials; and (3) that the contract for these was let pursuant to the charter.

4. Whether the city might not have contracted for laying said pavement at its own expense under its general municipal powers, is a question not here raised.

5. The tax whose collection is sought to be restrained, included the amount of a separate contract for *grading* the street. *Held,*

(1.) That if this contract was legal, still the sale of the land for the *whole* tax would be illegal.

(2.) In such a case plaintiff might be required to pay the valid portion of the tax as a condition of relief; but in this case the validity and equity of any part of the tax is not sufficiently clear to induce the court to exercise its equitable powers to enforce its payment.

6. Where a city improvement was unauthorized at the time it was contracted for and made, the legislature may subsequently confer anthority on the city council to adopt it, and to assess and collect a tax to pay for it.

7. But chapter 132, Laws of 1868, which provides that where any tax or assessment has been set aside and declared void by any court, "in consequence of any irregularity in any of the proceedings in levying" it, or of "any omission to comply with the forms of law" under which it was made, it may be reassessed, etc., does not apply to a case where the tax itself was not authorized by law.

APPEAL from the Circuit Court for *Dane* County.

Action to restrain the sale of certain lots in the city of Madison for the amount of a special tax assessed against them to pay for the construction of a "Nicholson" pavement in the adjoining street, and for grading the street to receive said pavement, and also to have said tax declared illegal, etc. Section 3, chapter 526, Laws of 1865, provides, that, whenever the common council of said city shall determine to grade and pave any street, they shall cause certain estimates of the amount of work required, and the expense thereof to each lot, to be filed in the city clerk's office, "for the inspection of the parties interested, before such work shall be ordered to be done," and shall fix the time within which the work must be done, and give a certain notice to the adjoining lot owners. If the work

is not done by them within that time, "the council shall immediately authorize *the letting of such work by contract to the lowest bidder*, at the expense of the lots upon which such work is chargeable, all bids for doing the same to be approved by the council; * * notice of the time and place of receiving such bids to be published," etc.  Section 19, chapter 461, Pr. and L. Laws of 1866 (which took effect April 14, 1866), empowers the common council, by a vote of two-thirds of its members, to "advertise and let to the lowest responsible bidder whose bid it shall deem reasonable and proper, * * the making of any improvement on or along any street in said city, which shall have been ordered, and levy a tax upon each lot or piece of ground in front of which such sidewalk, gutter or improvement, shall have been ordered and constructed under such contract, sufficient to pay the cost of constructing the same, *without giving notice requiring the owner or owners of such lot or piece of ground to construct the same.*"

On the 4th of May, 1866, the common council of said city instructed the city surveyor to establish the grade of the street adjoining plaintiff's lots, and other streets, and make an estimate according to law of the expense to each adjoining lot, of grading said streets to the established grade, and paving the same with the Nicholson pavement, etc.  On the 25th of the same month, at a meeting of the council, the surveyor reported a grade and estimates accordingly; and the grade so reported was then and there adopted by the council, and also an ordinance which required that said streets should be graded to the established grade, and paved with the "Nicholson pavement," and that the work should be done at the expense of the respective lots or parcels of land fronting on said streets, so that each lot or parcel should pay for the work in front thereof to the center of the street.  The ordinance further provided, that the work should be "done under the direction of the mayor, superintendent of streets and city surveyor;" and

authorized *them* "to advertise and make contract for the doing of said work." On the 15th of June following, the mayor of said city caused to be published a notice which stated that proposals would be received by *him, the said mayor, at his office,*. etc., "for doing the necessary grading, furnishing materials and paving with the Nicholson wooden pavement," the said streets, and for curbing the same; and that bids for paving and grading and curbing "might be received separately." This notice also contained the following statement: "Each bid must be accompanied by a guaranty signed by two sureties, who shall justify to their responsibility on oath, in a sum equal to the damages stipulated herein, conditioned that in case such bid be accepted and the contract awarded to the bidder thereon, such bidder will, within five days, enter into a contract to complete such work within a reasonable time thereafter, to be fixed by the council at the time of making the contract; and that in case said bidder shall fail to enter into such contract, or to complete the work as aforesaid, the said sureties will pay to the city the damages for non-completion, which shall be stipulated and agreed in such guaranty to be ten per cent. more than the amount to be paid by the city upon such bid." On the 20th of July following, the council accepted the bid of one Michael Collins to do the grading for said pavement, and the next day a contract was entered into with the defendant *John Collins*, for doing said work, the bid of said Michael having been transferred to him with the consent of the council. Collins' bid was accompanied only by the following guaranty, signed by two persons:. "We, the undersigned, do certify that we will become sureties for Michael Collins, that he will enter into contract for, and do the work mentioned in the foregoing proposal, if it be awarded to him, to the satisfaction of the city council." At the same meeting, July 20th, the council resolved to accept the bid of the defendant *Burnham*, "for laying down the Nicholson

pavement," on said streets, and authorized the mayor to enter into contract with said *Burnham* for the work. *Burnham's* proposal was the only one made to said council for laying said pavement, and it offered to lay it "for $3 per square yard," and to take "$2.50 in cash, payable as soon as laid." It was accompanied only by the following guaranty, signed by the defendant *Harrison:* "I hereby guaranty the performance of any contract awarded under the proposal to *Mr. George Burnham*, in such sum as may be fixed by the city council." *Burnham* and *Harrison* were partners in business, and assignees for the state of the patent for the Nicholson pavement. On the 14th of August, 1866, a contract was entered into by the mayor, in the name of the city, with *Burnham* and *Harrison*, for the laying of the Nicholson pavement on said streets, for three dollars per square yard, with a proviso' that the city should pay for that part of the work properly chargeable to it, upon the completion thereof, only $2.50 per square yard.

The complaint alleges, that the plaintiff was out of this state at the time the above mentioned ordinance was passed, and for a long time thereafter, and did not return until after the grading was finished and a portion of the pavement laid; that as soon as he heard of the proceedings of the council ordering said work to be done, he directed his agent in Madison to inform any person who had bid or intended to bid therefore, that he should resist the doing of the same or the collection of any tax to pay for it, and believes that the defendants *Collins*, *Burnham* and *Harrison* were so notified; that after plaintiff returned, it was too late to restrain said contractors from proceeding with the work without doing great damage to all kinds of business on said street; and that had he been at home when the contracts were let, he would have applied for an injunction to restrain them. It then shows the issue of certificates for said work to said contractors, and the proceedings thereon, including the published notice by the defendant *Charlton*, as county

treasurer, that he would sell plaintiff's said lot for the amount of the special assessment made for said work. In addition to the averments already stated, the complaint alleges, to show the illegality of said ordinance, 1. That at the time of its passage, no estimate of the whole expense of doing said work, etc., etc., required by the charter, had been filed in the office of the city clerk for the inspection of the parties interested, before such work was ordered to be done, and that no such estimates had *ever* been filed in said office. 2. That said ordinance did not fix the time within which the work should be done, nor did the published notice inviting proposals fix any time for that purpose, but expressly left the time to be determined by the council after bids had been received and contracts awarded. 3. That the bid for grading which was accepted was not the lowest bid received by the council for doing said work, and the contract therefor was not let to the lowest and most responsible bidder. 4. That the notice inviting bids for grading and paving, required them to be accompanied by guaranties of an extraordinary character, "so as to shut off bidders and prevent competition in bidding, to the great detriment and injury of the plaintiff;" and bids were then received and accepted, and contracts awarded and executed, without reference to such requirements, and without guaranty, to persons wholly irresponsible; and that such conditions were published in said notice for the purpose of preventing competition in bidding. 5. That the right to lay the "Nicholson pavement" was patented, and no person, not even plaintiff, could safely bid for the doing of said work, or lawfully lay said pavement, unless he purchased of the owners of said patent the right to do so; and that there could therefore be no competition in bidding. 6. That the price allowed for laying said pavement and furnishing materials was exorbitant; and that after paying for all work done and materials furnished, with a reasonable profit thereon, there still remained of the contract price a very large

percentage to be applied in payment for " the royalty of said patent." Other grounds of objection were stated, which need not be mentioned here.

The answer admits that the Nicholson pavement was patented, and that no one but the patentee and his assigns could lawfully lay the same; but alleges that they had offered the right to the public at sixteen cents per square yard, of which the plaintiff and all others interested in the work here in question had notice; and that " the plaintiff or any other person could have laid or bid for said work by paying said royalty to the patentee." The complaint also denies that the price agreed to be paid for said work was exorbitant.

On the trial, the city clerk testified in regard to the surveyor's estimates of the grading, filling, etc., to be done on said streets, and the cost to each lot, etc., as follows: " I can't say when they were in my office, nor that I ever saw them until the night they were presented to the council. I know they must have been in the clerk's office before the ordinance was passed. I must have taken them into the council chamber myself, and they must have been put into my hands before the ordinance was passed. I cannot tell whether they were in my possession before the evening the ordinance was passed, or not. They might have been there ten days before, and they might not. * * On mortgages filed in my office, I write 'filed,' with the day and hour; but on nothing else. There is no evidence upon that paper that it was ever in my office before the 25th of May, nor afterwards." The report of the surveyor containing said estimates was dated "May 24, 1866," and there was an indorsement of the date of approval "May 25, 1866, adopted." On cross-examination by the defendants, the clerk said, " I have no recollection as to when these estimates were filed. I cannot say that after they were filed they were left in my office. I have no reason to think that they were taken from my

office more than any other paper. I can't say how long they remained there. I think they were there over a month; know they are not there now, and have no recollection when they were taken away. * * I don't know but Mr. Drake (the city surveyor) might have taken them out; have no recollection about that, one way or another. He came and took some papers about the time the work commenced. * * I believe Mr. Flower, *Mr. Dean's* agent, came to my office and examined these estimates on file there. I can't say at what time it was; it was along during the discussion previous to the commencement of this work. I think it was before the letting of the contract." Mr. Flower, for the plaintiff, testified: "I went to the clerk's office to see these estimates, and they were not there; the clerk referred me to some other place to see them. I am sure I did not see them in that office at all; and I didn't suppose they were ever filed there or kept there. I subsequently went there with *Mr. Dean* on purpose to ascertain whether they were kept there or not, after the work had been commenced; I asked the city clerk about it, and he said they were not on file there. I asked him if they were ever on file there; and he said they might have been there two or three days. Don't recollect distinctly what time it was. Couldn't find them in the clerk's office when I first went there. My impression is that I was there three or four days after the ordinance was passed. I think I saw them within three or four days, but at the surveyor's office." On cross-examination, he said: "I saw the estimates at the city surveyor's office. The city clerk told me they were there; and I went there and examined them. The surveyor's office is in the same building, and on the same floor with the city clerk's office — at the other end of the building."

There was contradictory evidence as to whether a lower bid for the grading than that of Michael Collins was put in by the defendant *John Collins*, and opened and read to the

council, and afterwards taken out of the hands of the clerk by said defendant, and not considered by the council.

The court found, *inter alia*, that the estimates above mentioned had been filed in the office of the city clerk for the inspection of parties interested, before said work was ordered to be done; that the ordinance providing for said work, and the published notice of proposals therefor, did not fix the time within which the work should be done; that the conditions of the guaranty required by said public notice were not extraordinary as to kind or amount, and did not shut off bidders nor prevent competition in bidding, and worked no injury to the plaintiff; that the bid of Michael Collins, upon which the contract for grading was let to the defendant *John Collins*, was the lowest bid received by the council for such grading; that the usual market price of the right to lay the Nicholson pavement was sixteen cents per square yard, and the right to lay said pavement was for sale at that price, and said "royalty fee" of sixteen cents per square yard was included in the contract of the defendants *Harrison* and *Burnham* to lay the pavement here in question; that the plaintiff or any other person might lawfully and safely have bid for the laying of said pavement, and could have fulfilled their contracts and lawfully laid the same upon payment to the owners of said patent right of a royalty fee of sixteen cents per square yard, and that competition in bidding was not prevented, and the plaintiff was not injured nor damaged, because the pavement ordered to be laid down was patented. As conclusions of law, the court held that the contract with *Collins*, and that with *Harrison* and *Burnham*, and the special tax assessed upon the plaintiff to pay for the work done under them, were legal and valid. Judgment accordingly; and the plaintiff appealed.

*J. M. Flower* and *Spooner & Lamb*, with *Geo. B. Smith*, of counsel, for the appellant, contended that the tax was void because the city surveyor's estimate was not put on file in the

clerk's office in time to be inspected by the parties interested, before the work was ordered, nor kept on file there subsequently for the examination of lot owners and of persons wishing to bid. *Myrick v. La Crosse*, 17 Wis. 442; *Mitchell v. Milwaukee*, 18 id. 92; *Foote v. Milwaukee*, id. 274; *Kneeland v. Milwaukee*, id. 411; *Crane v. Janesville*, 20 id. 305; *Wells v. Burnham*, id. 112; *Kneeland v. Furlong*, id. 437. 2. Section 19, chapter 526, Laws of 1866, does not repeal that part of the statute which required that the council, in the order requiring such work to be done, should *fix the time* within which it must be done, and authorized a letting in case the owner failed to do it within that time. The only effect of the amendment is to dispense with the *notice* to the lot owner. The tax in this case is void because no time was fixed, nor opportunity given the plaintiff to do the work himself. 3. The guaranty required to accompany such bid, by the advertisement for proposals, was such an *abuse* of the discretion of the council as should condemn the whole proceeding. 4. The mayor, superintendent of streets and surveyor were authorized to advertise and contract for the work, and a majority at least of the three must have united in an execution of the power to make it valid, and the action of the mayor alone in this case was invalid. Story on Agency, §§ 14, 42, 444, note; Paley on Agency, 178, note; 3 Pick. 444; 2 id. 353; 12 Mass. 194; 12 N. H. 226; 9 W. & S. 56; 6 S. & R. 167. And the act of the mayor could gain no validity by ratification. "The rule that an act done without any previous authority may become beneficial to the person for whose use it was done, by his subsequent adoption of it, holds only where no immediate act is to be done upon it by a *third person*." Paley, 345; *Right v. Cuthell*, 5 East, 491; *Doe v. Walters*, 10 Barn. & Cress. 626; 1 Parsons on Con. 82 and 49, note; 7 N. H. 253; 9 id. 204; 10 Vt. 532; 22 Maine, 503; 26 Conn. 192; 22 Barb. 137: 1 Gratt. 226; 12 Rob. (La.) 221; 1 Eng. (Ark.) 473; 1 Am. L. C. 591. 5. Counsel argued that

the city officer had no right to contract for the payment by lot owners of fifty cents per square yard in addition to the *cost* price at which the contractors offered *to do* the work; that such officers cannot assume that any lot owner will not pay as soon as the work is completed, and if they could, the law has fixed the penalty at twelve per cent. per annum. 6. Work cannot be let to the lowest bidder, within the meaning of city charters, when, in the nature of things, there can be but one bid. Where the right to do the required work is secured by patent, only the patentee or his assignee can bid for the work. The fact that the right was offered for sale at a certain price per square yard, does not obviate the difficulty. No man could safely bid until he had bought the right (especially under such guaranties as those exacted by the mayor); and if he bought the right before he bid, then no one could bid against him, and the monopoly has only changed hands.

*Jas. G. Jenkins,* with *Hopkins & Foote,* of counsel, for the respondents, contended that under the charter of Madison and the decisions of this court, the plaintiff could not escape payment of the tax without showing errors affecting its *substantial justice.* Laws of 1865, ch. 526, § 7; *Wells v. Burnham,* 20 Wis. 112; *Stokes v. Knarr,* 11 id. 380; *Mills v. Gleason,* id. 470, 497; *Ableman v. Roth,* 12 id. 81; *Warden v. Fond du Lac,* 14 id. 618; *Kellogg v. Oshkosh,* id. 623; *Dean v. Gleason,* 16 id. 1; *Bond v. Kenosha,* 17 id. 284; *Smith v. Cleveland,* id. 556; *Houghton v. Burnham,* 22 id. 301. 2. It was within the discretion of the city authorities to determine what guaranties should accompany proposals; and it was right that they should impose such as would insure the completion of the work, and prevent irresponsible or dishonest bidders from defeating the contemplated improvement; and there is no pretense that parties were prevented from bidding on any such grounds. 3. The bid was to do the work at three dollars per yard. To induce parties to pay the cash, the contractor offered

to take two dollars and a half in cash. The city, however, had no power to agree for the lot owners to pay in cash, and as to them that part of the proposal could not be considered. The contractors could doubtless better afford to do the work at the lower price for cash, than at the higher, and wait to collect by process of law. 4. A patent right, or the interest of a patentee, is presumed to be governed by the usual laws of trade, and to have a market value, at which it is offered to the public. Besides, it was proved in this case that it was offered freely at sixteen cents per yard, that this was the established market price, so that any one could have bid, and then bought the right. 5. Counsel contended that the true and obvious intent of section 19, chapter 461, Pr. and L. Laws of 1866, to empower the common council, by a vote of two-thirds of its members, to contract at once for the construction of improvements, without giving the lot owners a fixed time to do the work themselves, it being plain that certain kinds of street improvement cannot properly be done piecemeal by the lot owners. It is absurd to suppose that the legislature meant to require a two-thirds vote of the council merely to dispense with the published *notice* to the lot owners, when the ordinance itself, which is required to be published, constitutes a sufficient notice.

The following opinion was filed at the February term, 1868.

PAINE, J. This action was brought to enjoin the sale of the plaintiff's lands for an assessment imposed upon them for paving the streets in front of them with what is known as the "Nicholson pavement." It is claimed that the proceedings failed in several respects to comply with the provisions of the charter, in matters so essential as to render the tax void. But another objection is taken, which goes to the foundation of the whole proceeding; and the conclusion to which a majority of

the court have come upon that, will preclude the necessity of examining any of the other questions. This objection is based upon the provisions of the charter requiring all work to be let by contract to the lowest bidder, and the fact that the right to lay the Nicholson pavement is a patented right, and was owned for the state of Wisconsin by one firm in the city of Milwaukee. It is said that the charter authorizes a contract only for such work as is open to competition, and that this work was not open to competition, because nobody had any legal right to do it except the one firm that owned the patent. Upon these facts alone the objection seems to me unanswerable. And nothing seems to be necessary beyond the simple statement of the requirements of the charter as to the mode of letting work, and the fact that this right was a monopoly, to show that the charter is inapplicable to it, and that a contract for this work would be in violation of the necessary implication from its provisions. Indeed, the counsel for the respondent, by their course of argument, seemed tacitly to admit that there was an apparent incongruity in applying the provisions of the charter to a contract for such work as this. And they sought to avoid it in two modes. First, they claimed that if it was clear that the charter could not be applied in such a case — that it would be a mere farce to advertise to let to the lowest bidder work which only one firm had any legal right to do, so that the very object of the charter, to procure the work to be done as cheaply as possible, might be defeated thereby — then it must be assumed that the legislature did not intend the mode provided in the charter to be applicable, and that the work might be contracted for without regard to that mode.

The other mode of avoiding the objection was, by proving that the owners of the patent were anxious and willing to sell the royalty, and had offered it for sixteen cents per square yard. And upon this proof it is insisted that the principle of

competition was preserved, and the requirements of the charter complied with.

I will state, as briefly as may be, why I think neither of these theories overcomes the objection. The first assumes the correctness of the position that the charter cannot be applied to a contract for work the right to do which is a patented monopoly. And it then infers, that because the charter is inapplicable, the city had the general power to make the contract without regard to its restrictions, and that such was the legislative intent. The error lies in this inference. This position was attempted to be supported mainly by the case of *The Harlem Gas Co. v. The Mayor, etc.*, 33 N. Y. 309. The counsel on both sides rely upon that case, and it will therefore be proper to examine it carefully, to see what position it sustains.

The action was on a contract for lighting certain streets in New York city with gas. The company had by law the exclusive right to furnish gas for that part of the city. The charter required all contracts for work and supplies, beyond a certain limitation in value which this contract far exceeded, to be let by contract to the lowest bidder. The contract for this gas was not so let, and therefore it was claimed to be void. The court held that inasmuch as the company had the exclusive right to furnish the gas, the provision of the charter requiring the contract to be let to the lowest bidder was inapplicable, and that it would be absurd to attempt to apply the provision in such a case. PORTER, J., says: "In the present case, an adoption of the construction claimed by the municipal authorities would lead to the absurd conclusion, that the legislature designed to force a provision into the city charter compelling the corporation to pay whatever price the sole bidder might choose to exact in his sealed proposals for the use of property in which he has an absolute monopoly, and in relation to which there can be no competition within the range of legal possibility."

BROWN, J., says: "Had the common council, in place of this condition, invited proposals in the usual form, there could have been but a single offer at best, and the provisions of the statute would have failed of effect, because they were not applicable to such a subject."

The case, therefore, fully sustains the position of the appellant's counsel, which seems obvious enough in itself, that a provision requiring work to be let to the lowest bidder is not applicable to a contract for work as to which there can be no competition. And if not applicable to it, of course it can furnish no authority for such a contract. And if such a contract is made, it must be sustained, if at all, by authority derived from some other source than such a provision of the charter.

But the court in that case did hold the contract valid, and the city liable. And this branch of the decision the respondents' counsel rely on, to sustain their position, that, if the charter was inapplicable, these proceedings should be sustained, whether conducted in accordance with it or not. But the cases are so different in respect to the grounds of that part of the decision, that it becomes inapplicable here. The power to contract for the lighting of the streets of the city was assumed, in that case, to be one of the general powers of a municipal corporation. Hence, so soon as the court came to the conclusion that the mode of contracting pointed out in the charter was inapplicable in such a case as they had under consideration, they had no difficulty in sustaining the contract under the general corporate power of the city. But here the question is quite different. It is not necessary to inquire whether the city of Madison, by virtue of its existence as a municipal corporation, would have had the power to contract for paving its streets with the Nicholson pavement, at the expense of the city, after discovering that the provisions of the charter enabling it to cause its streets to be paved at the expense of the lots

were inapplicable for that purpose. If it had had such power, and had made such a contract binding the city at large, the question would then have been like that decided by the New York court. But here it made no such attempt. It seeks here to charge the expense upon the lots, and this it has no general power to do by virtue of its mere existence as a municipal corporation; but, if done at all, it can only be done under the statutory authority in its charter, and by complying substantially, if not strictly, with all its requirements. So soon, therefore, as we arrive at the conclusion, that these requirements are inapplicable and inadequate to a contract for a work the right to do which is an exclusive monopoly, it ends the question; for there is no general power of the city to fall back upon.

I think, therefore, that while the case in New York does show that the contract in this case was outside of the scope of the provisions of the charter, it fails to show any general authority in the city by which it could be sustained, independent of those provisions. In truth, it would seem too late for us now to say that these requirements of the charter are not applicable to contracts for paving streets, for the contrary has uniformly been held by this and other courts. *Myrick v. La Crosse*, 17 Wis. 442; *Mitchell v. Milwaukee*, 18 id. 92; *Kneeland v. Furlong*, 20 id. 437; *Brady v. New York*, 20 N. Y. 312.

Neither can I see that the other mode of answering the objection is successful. On proof that the owners of the patent were willing to sell the "royalty," as it is called, for sixteen cents per yard, it is said that other parties might have bid, and the principle of competition was preserved. If an arrangement had previously been made, by which the owners of the patent became bound to transfer the right at sixteen cents per yard, and the contracts had then been let in pursuance of the charter, for the materials and labor, subject to the condition of obtaining the patent, the principle of competition, so far as the

labor and materials were concerned, might have been pre-
served. But even in that case there could have been no com-
petition as to the price of the royalty. So far as that consti-
tuted a part of the cost, there was no possibility of introducing
this principle at all. But if the method suggested had been
resorted to, so as to preserve competition in the labor and
materials, perhaps the fact that it could not be preserved as to
the comparitively small balance of the expense, would not have
avoided the whole. It is unnecessary to determine whether so
strict an application of the spirit of the charter would have
been required.

But no such method was resorted to. On the contrary, the
proposals were for furnishing the materials and doing the work,
without any thing in regard to the price of the royalty, and
without any previous agreement with the owners of it. There
could be no competition in this method. The fact that the
owners were willing to sell it at sixteen cents per yard, does
not show that there could have been. For, assuming that any
contractor might have safely relied on the willingness of the
owners to sell it at that price, and assuming that the latter, in
case they desired to bid for the work themselves, would not use
their power over the patent to aid in obtaining the contract, as
far as possible, by preventing others from getting it — assump-
tions which it would scarcely be safe for contractors to act
upon — still there could have been no safety in bidding. For
suppose A, B, and C, all bid, none of them making any previ-
ous arrangement for the purchase of the royalty? Before the
bids are opened, one of them, thinking to get the contract,
desiring in good faith to do the work, goes to the owner of the
patent and buys the royalty for that part of the city where
the work is ordered to be done. The bids are opened, and
some one else has the lowest bid, and gets the contract. What
position would the successful bidder be in, bound under some-
what severe penalties to enter into and complete his contract,

and yet with a rival and disappointed bidder having the sole legal right to do the work? Certainly this shows that no contractor could safely bid, and bind himself, in the manner here required, with sureties and stipulated damages for a failure, without in the first place procuring the right from the owners. For, although they might be willing to sell, that very willingness would make it unsafe for him, because some other bidder might step in and secure the right, in anticipation of the opening of the bids. But if any contractor should, before bidding, purchase the right, then nobody, except him, could safely bid. It seems clear, therefore, that proof merely of the willingness of the owners to sell the right at a fixed price, does not preserve competition. And the result in this instance, if not conclusive, is yet very satisfactory proof of it. There was no bid except that of the owners of the patent.

It has been compared to the case of work ordered to be done with a particular kind of stone, the quarry of which is owned by one who is willing to sell to all alike at a fixed price. Undoubtedly in that case there might be free competition. If the owner of the quarry, before the contract was let, should sell to one bidder enough stone for that work, he might the next day sell as much to another bidder. And if neither of these should get it, he might afterward sell whatever was needed to such person as did get the contract. Such being the case, any bidder could safely wait until he obtained the contract before making arrangements for his stone. But there is a marked difference in the case of the patent. There the owner, having disposed of the right for any particular district to one person, cannot afterward furnish the same right to any other. This difference destroys the whole force of the illustration, and shows that the safety of bidders would be very different in the two cases.

It seems to me, therefore, a conclusion derivable from the very nature of the case, that competition could not be and was

not preserved in the letting of this contract; and that it was, therefore, beyond the scope and in violation of the spirit of the charter.

It may be said that this pavement is of a superior character, and that it is very desirable that cities should have authority to cause it to be laid. It may be so, but if so, I think the aid of the legislature will have to be invoked, and that there is no authority to contract for it under charters which require the work to be let by contract to the lowest bidder.

It was suggested that even though this assessment should be held illegal, still there was nothing to show it to be inequitable, and therefore a court of equity ought not to interfere. But that principle has never been applied to these special assessments. And certainly it could not be applied where there is no legal authority to contract for the work at all, to pay for which the assessment was imposed.

I think the judgment should be reversed, and the cause remanded, with directions to enter judgment for the plaintiff for a perpetual injunction according to the prayer of the complaint.

*By the Court.* — Ordered accordingly.

DIXON, C. J., dissented.

The respondents moved for a rehearing, and the following opinion was filed at the February term, 1869:

PAINE, J. The arguments presented on the motion for a rehearing have not changed the views of the majority of the court, as expressed in the opinion already filed. But as a rehearing is claimed upon one or two grounds not noticed in that opinion, we will briefly state the reasons for denying the motion upon those points.

The first is, that the claim of *Collins* for grading the street was legal and ought to have been allowed, even though the

council had no power to contract for the laying of the Nicholson pavement. But even if this were so, the only question it would present in this action is, whether the payment of that claim ought to have been required as a condition precedent to the relief sought. For, as the tax included the whole, the sale would have been illegal, although some part of it might have been valid. But we have come to the conclusion, that, so long as we adhere to the decision on the main question, there is not a sufficiently clear ground to justify us in interfering in this action to compel a separate compensation for the grading. The grading, although let by a separate contract, was merely accessory to the principal contract for paving the street. It was to prepare the street for the pavement, and doubtless would not have been ordered except in connection with the order for the pavement. The whole matter will doubtless be adjusted hereafter, either by obtaining sufficient authority from the legislature to enable the council to adopt the Nicholson pavement as laid, and to assess and collect a tax for it; or, if this should be refused, by the council's conforming its action in paving the streets to the authority it already has. Whenever this is done, the tax for the grading will be assessed and collected with the other. And we deem it more advisable to let it take this course, than to attempt now to compel its payment by an exercise of the equitable jurisdiction of the court, when we cannot determine with certainty whether the grading, by itself, would not have been a detriment rather than an advantage to the lots.

But it is further claimed, that even if this pavement was authorized at the time it was contracted for, still the legislature may subsequently confer authority upon the council to adopt it, and to assess and collect a tax for it. And it is then insisted that the legislature has already done this.

The general proposition, that the legislature may confer such authority, has been already sustained by the decision of this

court in *May v. Holdridge, ante,* p. 93. But I cannot assent to the position that it has done so in this instance.

The position is based upon the provisions of chapter 132 of the general laws of 1868. But that merely provides that where any taxes or assessments have been set aside or declared void by any court, in consequence of any irregularity or neglect to comply with the law in the proceedings, it may be afterward reassessed. It applies, therefore, obviously only to such taxes and assessments as were authorized by law. Where there is an irregularity or defect in assessing these, they may be reassessed. But it would be a strange use or abuse of such a statute, to say that it would extend to the assessment of a tax which was defective, not on account of mere irregularity in the proceedings, but for an entire want of authority. That is the ground of the objection to the tax here in question, and this statute has therefore no application to it.

DIXON, C. J., *dissenting*. After this cause was decided, and pending the motion for a rehearing, the case of *Hobart v. The City of Detroit,* 17 Mich. 246, was decided by the supreme court of Michigan. The questions involved in the cases are the very same, the language of the Michigan statute being word for word like our own. They were new questions in that court, as well as in this; but having first been decided by this court, the opinion of the majority here was there cited and relied upon. The decision there is the reverse of that here made, and the opinion of the court by Chief Justice COOLEY is such a clear and able statement and vindication of my own views, that I have thrown aside an opinion partially written before the report came to hand, and am entirely satisfied with a mere reference to that case. I would, however, call attention to a single fact appearing in this case, but not in that, which seems to make very much more strongly against the decision here. It was conclusively shown in evidence here, that any person

Dean vs. Charlton, Treasurer, et al.

wishing to become a bidder, or to lay the pavement, could obtain from the owners of the patent the right or royalty for so doing by paying to them a certain fee or sum for each square yard of pavement laid. The patent, or right to lay the pavement, was shown to have had an established market value, at which it could be obtained by any person desiring to avail himself of the invention. The mayor and aldermen of the city, and the public generally, were informed by the owners, at and before the time of letting the contract, "that any person could have the right to put down the pavement and secure the bid for it" upon the payment of such price or fee. This fact, as it seems to me, clearly shows that, instead of competition being impossible, the doing of the work was open to the fullest competition. The patent fee, or price of the right, being fixed and known, every person could bid with reference to it, as well as to the cost of labor and materials.

But it is said that after the biddings were closed, and the contract awarded, the owners of the patent might refuse to convey to the successful bidder, or might convey the right as to the particular street or streets to some third person, and that this circumstance, or the anticipation of it, would deter bidders, and defeat the principle of competition. I say, not necessarily so at all. In the first place, it is not to be presumed that the owners of the patent would so conduct themselves under any circumstances. Their property in the patent is of that peculiar kind, that its only value to them consists in the sale of it, or what may be realized from the sale. They hold it for sale at an open, fixed market price, and it is for their interests to introduce the improvement and extend the demand for it as much as possible. It is not to be presumed, therefore, that they would pursue a course so detrimental to their own interests as this would be, by discouraging purchasers, and preventing the public from using the invention. But if this be not the presumption, and the contrary, and, as it seems to me,

most unreasonable and violent one is to prevail, what then would be the effect upon the bidding? Would it deter bidders, and prevent competition? Would the successful bidder, if not the owner of the right, be obliged to forfeit his contract and pay the damages? Or might he proceed to its fulfillment? I think, notwithstanding the refusal of the owners or owner to convey the right to him, that he might proceed and perform the contract, and that the consequences to him would be the same, or very nearly the same, as if the right were voluntarily conveyed to him. If an action at law were brought for the infringement, the amount recovered would be no more than the contractor would otherwise be obliged to pay. The measure of damages in such case would be the market price or customary charge for the right, with interest added. *McCormick v. Seymour,* 3 Blatchford's R. 209; *Sickels v. Borden,* id. 535. If a suit in equity were commenced, and an injunction sought, it would be denied upon the contractor's showing that he had tendered the customary fee or charge, which was not accepted. The owners of the patent, after holding out to bidders that they were ready and willing to convey to them for the usual compensation, would not be permitted to harass and annoy them by ill-founded and vexatious proceedings of this nature. And I think, under the circumstances, that equity would go farther, and would restrain the owners from suing at law upon proof that the customary charge had been tendered.

I conclude, therefore, that there was no ground whatever in this case for holding that the contract was not open to the fullest and freest competition on the part of all persons wishing to bid, and that it was not on that account illegal or void. I thought, and still think, that the judgment of the circuit court should have been affirmed.

I desire also to call attention to the case of *Astor v. The Mayor, etc., of New York,* in the supreme court of the first judicial district of New York, as yet unreported, in which the

same questions arose, and were decided in the same way as by the supreme court of Michigan, though upon somewhat different grounds. It was there held that the statutory principle or requirement of competition did not apply where the article to be furnished or thing to be constructed for the corporation was the subject of a patent or monopoly, and that the contract was for that reason valid, although in form let to the lowest bidder. I have endeavored to show that, if the principle does so apply, there existed no obstacle in the way of its full and free operation, so far as the contract here in question was concerned.

*By the Court.* — The motion for a rehearing is denied.