DEAN vs. BORCHSENIUS, County Clerk, and others.

MUNICIPAL TAXES.   *Power of legislature to authorize municipal corporations to re-assess void tax — Unconstitutional tax cannot be aided by subsequent legislation — Construction of statute — Conditions of equitable relief against tax.*

1.  Ch. 316, P. and L. Laws of 1869, authorizing the re-assessment and collection of certain special assessments upon adjoining lots to pay for constructing the " Nicholson pavement " upon certain streets in the city of Madison, where the first assessment had been adjudged invalid and its collection enjoined, *held* a valid enactment; following *Mills v. Charlton*, 29 Wis., and *Evans v. Sharp*, Ib.

2.  The legislature may authorize a municipal corporation to re-assess a tax or special assessment which is void, or has been adjudged void,

Dean vs. Berchsenius, County Clerk, and others.

by reason of any defect or irregularity in the proceedings, provided the proceedings actually had as the foundation of the levy were such as the legislature might have authorized in the first instance.

3. But a tax levied in contravention of the constitution (as one contravening the rule of uniformity), though levied in pursuance of a previous legislative act, or a tax fraudulently and corruptly laid, and unjust and partial in its operation against the provisions of laws existing at the time, cannot be aided or made effectual by a subsequent act for its re-assessment.

4. The legislature may, in the first instance, authorize a tax or assessment for street improvements without requiring the contract to be let to the lowest bidder, or that notice be given of such letting; and it may therefore authorize the re-assessment of a tax (for an improvement already made), which is void for a failure to let the contract to the lowest bidder or to give notice of such letting, as required by the then existing law.

5. The provisions of said ch. 316, which relate to the *grading and paving* of streets *with the Nicholson pavement*, in their usual and obvious sense, include all processes usually employed and necessary to prepare the street for such pavement, including the "sand-filling;" and the act is therefore held to authorize the re-assessment of the sand-filling tax.   1 Taylor's Stats., § 1, subd. 1.

6. While in construing acts of this character, all reasonable doubts as to the intent of the legislature should be resolved in favor of the citizen, and the act should have only such effect as the legislature clearly intended (*Dean v. Charlton*, 27 Wis., 522), still the language is not to be turned from its natural and obvious import, so as to defeat the legislative intent.

7. The uninterrupted practice of a government through a long series of years, with the acquiescence of all its departments, is sometimes decisive even upon questions of constitutional construction.

8. In view of the uniform practice in this state since the adoption of its constitution, and also in view of the practical difficulty in the way of any legislative restriction upon the power of municipal corporations to make street improvements at the expense of adjoining lots, this court cannot now declare void the act here in question, and the grants of power in all city charters as to special assessments, as being in violation of sec. 3, Art. XII. of the state constitution, because they fail to restrict such power " so as to prevent abuses therein," whether by limiting the amount to be assessed upon any lot to a certain percentage of its value, or otherwise.

9. An averment that a certain contract for street improvement was not let to the lowest bidder, but that another bid was put in at a lower rate,

does not show any violation of law in that respect, without further averments showing said lower bid to have been made in such form, and accompanied by such guaranty, as were lawfully required by the municipal authorities.

10. In a suit to set aside a former assessment for the same improvement, it was adjudged that the contract in question was let to the lowest bidder. *Quære*, whether this must not be treated as *res adjudicata* in the present suit.

11. The bid for the construction of Nicholson pavement in front of plain. tiff's lots and elsewhere, was made at *three dollars* per square yard, or *two dollars and a half in cash*, payable as soon as laid. *Held*, that the assessments against lot owners cannot be impeached for the acceptance of a bid in this form.

12. The contract, however, having been let to such bidder at *three dollars* per square yard as to work chargeable on plaintiff's lots, if plaintiff had tendered or offered to pay the lower price in cash as soon as the work was done and accepted, he would have ground for legal or equitable redress.

13. But never having made any such tender or offer, he does not appear to have been injured by the omission from the contract of the provision for the lower price.

14. One of plaintiff's lots was sold to make an aggregate amount which included a tax for *curbing* the sidewalk in front thereof, and there was no valid contract for such curbing, and the tax therefor has never in fact been re-assessed by the city council (whether authorized by the act of 1869, or not). *Held*, that upon paying the taxes *legally* assessed upon said lot, with interest from January 1, 1870, plaintiff will be entitled to an injunction against the issue of a deed of the lot, based upon said sale.

15. A cause of action being stated as to said lot, an order sustaining a demurrer to the whole complaint for insufficiency must be reversed.

APPEAL from the Circuit Court for *Dane* County.

This was an appeal from an order of the circuit court of Dane county sustaining defendant's demurrer to the complaint. The facts set forth in the complaint are substantially the same as those presented in *Dean v. Charlton*, 23 Wis., 590 and *Mills v. Charlton*, 29 Wis., decided at the last term of this court, except that the complaint sets up in addition to the other taxes a small tax for curbing alleged to be void, and except that the action is brought against the county clerk to set aside a sale of

the property for unpaid assessments, instead of being brought against the county treasurer to prevent a sale. The facts are also stated fully in the opinion of the court.

*Stevens, Flower & Morris,* for appellant.

*H. S. Orton and S. U. Pinney,* contra.

DIXON, C. J. This is one of the never-ending Madison Nicholson pavement cases, a litigation which bids fair to long outlast the being and usefulness of the pavement itself, which has been the unfortunate source of it. The case comes up on demurrer to the complaint, which was sustained in the court below, and from which the plaintiff appeals. The action springs in part from the same state of facts presented in *Dean v. Charlton,* 23 Wis., 590, and a sufficient history of the past litigation and of the decisions of this court made in it, will be obtained from a reading of that case and of the still more recent one of *Mills v. Charlton,* 29 Wis., decided at the last term of this court. The property known as the King street property, or parts of lots 1 and 2 in block 104, is that in controversy in *Dean v. Charlton,* whilst the property on Pinckney street, described as lot 8, block 101, was at the same time (in 1868) the subject of a separate suit, not brought to this court by appeal, but which by stipulation was to abide the result of the suit which was appealed. Both pieces of property, or the taxes assessed against them are included in this action, which is instituted to restrain the county clerk from executing and delivering tax deeds in pursuance of sales of the lots, made on the 10th day of May, 1870, by the county treasurer of the county of Dane. The sales so made were in pursuance of a re-assessment and re-levy of the taxes to pay for the pavement, made by the common council of the city of Madison in the months of September and November, 1869, under special authority for that purpose, conferred by the act of the legislature, approved March 9, 1869, being chapter 316, Pr. and Local Laws, 1869. The proceedings for the re-assessment and re-levy of the taxes, the return to the

county treasurer, and the sales and issuing of the certificates by him, are particularly stated in the complaint, and the resolutions of the common council, together with the pleadings, findings and judgments in the former suits, are set forth *in hæc verba*, or nearly so.

It appears from the statements so made and admitted by the demurrer, that the taxes assessed in the aggregate were made up of items for different parts of the work described in the proceedings, as follows: that is, the grading, the sand filling, the paving (which included the furnishing of the materials and laying down of the pavement), and the curbing. Separate assessments for these different kinds of work, except the curbing, were made against the King street property, and the like assessments were made upon the property on Pinckney street, except that in the assessment for the paving, there was included also a tax of $15.84 for curbing done in front of that lot. It appears from the proceedings originally taken by the common council in ordering the pavement, that the streets were to be graded to the established grade, and to be paved with the wooden block pavement, known as the " Nicholson pavement," and to be properly curbed according to the plans and specifications furnished by the city surveyor, and in the advertisement for bids, signed by the mayor, it was specified that the whole was to be curbed at the sidewalk line with curbstone curbing, five inches thick and of the requisite depth; that bids for grading, paving and curbing might be received separately, and that each must be accompanied by a guaranty signed by two sureties, who should justify their responsibility on oath," etc. It also appears that bids were received and accepted, and contracts let separately to different persons for the grading, the sand filling, and the paving. It does not appear that any bid for curbing was ever made, or any contract let. It does not appear that any curbing was, in fact, done in front of the King street property, or at least that any tax or assessment for that purpose was levied or made. In the certificate made and

issued to Burnham & Harrison, who were the paving con-
tractors, and laid the pavement, certifying that they had laid it
in front of the lot on Pinckney street, and that the same was
thereby accepted and approved, was also a further statement,
that they "had furnished and made in front of said lot eight,
two hundred and sixty-four feet of lineal curbing, at sixty
cents per foot." Burnham & Harrison made no bid for the
curbing, but only for the paving, and the work of curbing was
not mentioned in their contract.

The bid of Burnham & Harrison for the paving was $3 per
square yard, or $2.50 in cash, payable as soon as laid. The
contract entered into by the city with them was $3 per yard,
chargeable to the lots fronting on the improvement, and to be
paid by special assessment on those lots, and not otherwise, but
for work done at the expense of the city, and to be paid for in
cash out of the treasury, $2.50 per yard was the price agreed.
The contract did not, in accordance with the terms of the bid,
reserve to lot owners the right to pay $2.50 per yard in cash as
soon as the pavement was laid and accepted.

The resolutions of the common council, passed in pursuance
of the authority conferred, or supposed to be, by the act of
1869, are three in number, and refer to the work according to
the above classification of "the paving," "the sand filling," and
"the grading," and each by itself adopts, as a valuable improve-
ment, one particular kind of the work, and authorizes and di-
rects a re-assessment of the special taxes to pay for it, namely,
the first resolution, the paving; the second, the sand filling;
and the third, the grading. "The curbing" is not mentioned
in any resolution, and no re-assessment for that appears to have
been authorized or directed.

The contract for the grading was let to one Collins, for the
sum of thirty-nine cents per cubic yard, upon a bid received
from him at that price. The complaint alleges that "the bid of
said Collins so as aforesaid accepted, was not the lowest and
best bid for doing said grading, but that a bid was made and

put in to do said grading at the rate of thirty-two cents per cubic yard." It appears that the bid of Collins was regular in form, and accompanied by the requisite guaranty, signed by two sureties, as prescribed by resolution of the common council, and authorized by law. Laws of 1865, ch. 526, sec. 3. It will be observed that the other bid alleged "upon information and belief" to have been put in at thirty-two cents per cubic yard, is not averred to have been regular in form, or to have been guarantied by sureties in the mode required.

The contract to furnish and deliver the sand, necessary for the bedding of the pavement, was awarded to one Gill for the sum of eighty-five cents per cubic yard, that being the amount of his bid, but the complaint avers "that no notice of proposals for furnishing sand for Nicholson pavement was made and published in any manner or form whatever, prior to the time of receiving and opening said bid, and that no contract was, in fact, made with said Gill for doing said work, further than by the acceptance of his bid as aforesaid." The charter of the city, at that time required all work of the kind to be let to the lowest bidder, after publication of notice for at least the period of ten days in the official paper of the city.

Such, in brief, are the leading and most material facts, necessary to a proper understanding of the questions of law, presented in this case.

The complaint appears, also, to have been drawn with a view to contesting the constitutionality of the act of 1869, under which the re-assessments were made, and also the power of the legislature to authorize re-assessments in cases where proceedings for that purpose have been enjoined and the same declared invalid by the final judgment of a court of competent juris diction. These questions, save one which will hereafter be noticed, were adjudged adversely to the plaintiff in *Mills v. Charlton, supra*, and *Evans v. Sharp*, 29 Wis., and further remark upon them is unnecessary.

The first point made by the counsel for the plaintiff, is that

the act of 1869, did not in terms nor by necessary or fair implication, or construction, authorize the re-assessment of the taxes for the sand filling, and that so far the proceedings of the common council are void. In support of this position, counsel invoke the rule stated in *Dean v. Charlton*, 27 Wis., 522, that acts of this nature are in derogation of the rights of the citizen, and should be strictly construed. The first section of the act authorizes the common council to re-assess and re-levy the amount "in cases where the tax, assessment or assessments *for grading or paving* the streets or alleys of said city, either with the pavement known as the ' Nicholson pavement,' have heretofore been set aside or declared void by any court," etc. The last half of the second section is much to the same effect, except that in addition it declares that "the ordinance heretofore passed directing and requiring *the grading and paving* of certain streets in said city with the ' Nicholson pavement,' is hereby legalized and the contracts therefor confirmed, and the tax and assessment therefor is hereby declared valid," and then follow words authorizing and empowering the common council to re-assess said taxes and assessments, substantially as in the first section. The question as to what effect, if any, can be given to the provision declaring the contracts, tax and assessment valid without a re-assessment or re-levy by the common council, and even though the same had not been declared void by the judgment of a court of competent jurisdiction, is still an open one in this court. That question does not arise here, since it is only by virtue of the re-assessments by the common council that any rights on the part of the city or third persons are claimed, and the question is whether those re-assessments were authorized by the act within the rule of construction above referred to. It is obvious to our minds, that when the legislature spoke of paving the streets and alleys with the Nicholson pavement, or of " grading or paving," in the disjunctive as in the first section, or of " grading and paving " as in the second section, that the whole work of improving the streets by that kind of pavement

was intended. This is in accordance with the view of the court in *Dean v. Charlton*, 23 Wis., 609, where it was said that "the grading, although let by a separate contract, was merely accessory to the principal contract for paving the street." The same is as true of the sand-filling as of the grading. "It was to prepare the street for the pavement" and was accessory to and constituted a necessary part of the work of laying the pavement. When, therefore, we speak of paving a street with Nicholson pavement, or of grading it and paving it with such a pavement, we mean all the different kinds of work necessary to the production or laying down of a pavement of that description. The words would be so understood according to the common and approved usage of the language, and such must be their construction when found in a statute, unless the use in a different sense is clearly manifested. 1 Tay. Sts., 180, § 1, subd. 1. Such being the natural and obvious import of the language employed, the question is whether it can be turned to a different intent, or so as to defeat the purpose of the legislature, by an application of the doctrine of strict construction. We think not. The rule means no more than this, that in construing such laws, all reasonable doubts as to the intent of the legislature, should be resolved in favor of the citizen, and that the laws should only have such effect as the legislature clearly intended to give them. Such is the language of the opinion in *Dean v. Charlton* first referred to, and it was never intended to assert that the rule should have any other or different application. We hold, therefore, that the act authorized the re-assesment of the sand-filling tax.

It is said that the act violates the provisions of section 3, article XII of the constitution, which makes it the "duty of the legislature in providing for the organization of cities and incorporated villages, to restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent abuses in assessments and taxation, and in contracting debts by such municipal corporations." This is

Dean vs. Borchsenius, County Clerk, and others.

not the first time this objection has been urged before us in cases of this kind, and we have given it considerable study and attention. It is easy for the legislature to impose restrictions where money is to be borrowed, debts contracted, or credit loaned, and to such cases this court has held the provision of the constitution applicable. *Foster v. Kenosha*, 12 Wis., 616. *Fisk v. Kenosha*, 26 Wis., 23. But it is not easy to see how the legislature may do the same thing with respect to street improvements, such as the grading and paving of streets and construction of sidewalks and gutters, in all our numerous cities and villages, a duty the intelligent and proper performance of which would require direct legislative examination and forethought as to the condition and requirements of each particular street in every city and incorporated village throughout the state. It is manifest that what would be a suitable and necessary improvement and reasonable expenditure of money upon one street of a city or village, might not be so upon another or other streets of the same city or village, but would be an abuse of the power of assessment and taxation. A restriction upon the power regulated by a percentage of assessment or taxation upon the value of property fronting on all the streets of a village or city would, therefore, fail to accomplish the purpose. Abuses of the most serious character, if the local authorities were so disposed, might still intervene, for under that system what would be a proper expenditure of money on one street, might be a most improper, unjust and oppressive one on another, and the evil would still be unchecked. A Nicholson or other expensive pavement might be required on a business street and not required on a street occupied with valuable and costly residences, and yet the valuation of the property might be the same on both streets. To impose any wholesome and effective restraint and prevent abuses, therefore, in case that was the intention of the constitution with respect to assessments of this description, it would become necessary for the legislature to examine and discriminate as to the character and expense of the

improvements to be made upon the different streets in the numerous cities and villages everywhere in the state. Did the framers of the constitution intend by the clause in question to impose any such onerous and almost impossible duty upon the legislature? We are constrained to think that such was not the intention, or if by possibility it might have been, that it is too late now so to construe and apply the language. It would be a most astonishing declaration to come from this court at the present day, that we have not now and never have had from the beginning of the government, a single valid and constitutional city or village charter or organization within the state, and yet such would be the effect of holding the proposition contended for by counsel. Every city and village charter passed since the foundation of the state, a period of nearly twenty-five years, during which all of our cities and villages have grown up and been organized, and every act done under such charters in respect of the improvement of streets, must inevitably fall and be adjudged unconstitutional and void. If such had been the intention of the constitution, it should have been thought of before these re-assessment cases came up, and the fact that it never was so thought of, is very strong evidence it was not the intention. The uninterrupted practice of a government prevailing through a long series of years, and the acquiescence of all its departments, legislative, executive and judicial, sometimes become imperative even on constitutional questions. If ever there were such a case, this would seem to be one, and the objection of counsel must be overruled.

Another objection is that the grading tax was fraudulent in the first instance, because the contract for doing that part of the work was not let to the lowest bidder. It is insisted that a tax wrong in substance and in principle,—inherently unjust and vicious, cannot be legalized or made valid as a whole, or without correction, by subsequent legislative enactment. The correctness of this proposition will not be disputed, and nothing in conflict with it has ever been asserted or maintained by this

court. A tax levied in contravention of the constitutional rule of uniformity, whether by authority of a previously supposed law or without, could not be legalized by subsequent act of the legislature. A tax fraudulently and corruptly laid, and unjust and partial in its operation against the provisions of existing laws, could not be so validated, or aided or made effectual by subsequent re-assessment. This court has never asserted any different doctrine. All that has been affirmed is that the legis-·lature may ratify and cure through re-assessment by the local authorities, that which it might have constitutionally and lawfully authorized in the first instance. Whatever in the form and mode of proceedings not going to the groundwork and justice of the tax which has failed, the legislature might have dispensed with in the first instance, the same dispensation may be granted afterwards. It may dispense with the giving of a notice where that was made necessary, or with the exposing of work to competition by receiving bids and awarding it to the lowest bidder, where that was required, or with other like informalities in the proceedings to make an assessment or levy a tax. These things, though in general very expedient and wise, cannot be said to be essential to an exercise of the taxing power. It may be constitutionally exercised without them, and hence they may, in the discretion of the legislature, be dispensed with. An assessment made to pay for a pavement laid by contract with the municipal authorities, without receiving bids, that being the mode authorized by statute, would undoubtedly be valid. No one, we think, will question this proposition, or insist that the legislature *must* in the first instance, require biddings or cause notices to be published or given. If this be so, then the conclusion necessarily follows that the legislature may, upon the same state of facts, and where in its judgment the public interests and ends of justice require, ratify and confirm past proceedings defectively taken, and authorize a future assessment to pay for such pavement. Such, in short, are and ever have been the views taken by this

court, of this most important question. But to return to the point here urged, that the contract for doing the grading was fraudulently let. This does not appear from the pleadings, the allegations of which, with regard to that contract, are above quoted. It is not averred that the bid at the rate of thirty-two cents per cubic yard was in proper form, or that it was accompanied by the requisite guaranty, with sureties. Sufficient facts are not stated to show that it was a valid bid, and there is not even a general averment that it was so. Fraud or corruption in rejecting it and receiving the other are not charged. The demurrer admits only such facts as are well pleaded, and for all that appears it may have been such a bid as the common council were not authorized to receive or were bound to reject.

A still further answer to the same objection may perhaps be found in the finding and judgment of the court in the former suit, set out in the present complaint, from which it appears that it was there determined that the bid upon which the contract was awarded, was the lowest bid received by the common council for the grading. This may be and probably is *res adjudicata* and conclusive against the plaintiff in the present and all future actions.

The objection that the sand-filling tax could not be rectified or re-assessed because the contract for that purpose was let without publication of notice and without receiving bids in the manner prescribed by the charter, is answered by the remarks which have already been made. It was competent for the legislature to ratify and for the common council, in pursuance of the authority so given, to re-assess that tax. No charge of fraud is made or that the contract was corruptly let, and doubtless none could be proved.

We come now to an objection upon which we think the plaintiff must prevail, and that is as to the invalidity of the curbing tax. It will be seen, from the statement of facts, that no contract was ever let for doing the curbing, and that the amount therefor was illegally included in the certificate for pav-

ing done by Burnham & Harrison. It will also be seen that, whether authorized or not by the act of 1869, no re-assessment for curbing was ever made or ordered by the common council. The curbing tax, therefore, amounting to $15.84, included in the sale of the Pinckney street property, lot 8, block 101, is an illegal excess, and avoids that sale and the certificate issued to the purchaser. As to the King street property, no objection to the tax is shown, and the sale must stand unless the complaint should be amended and further facts shown. The demurrer, however, being to the whole complaint, that it states no cause of action, should have been overruled. A good cause of action is stated as to lot 8, block 101. Upon the facts alleged, the plaintiff is entitled to an injunction restraining the issuing of a deed upon the certificate of sale of that lot, on payment by him of the taxes legally assessed thereon, with interest at seven per cent. from the first day of January, 1870, that being the time from which delinquent land taxes draw interest by general law.

An objection omitted in its order, and which should be noticed, is upon the failure of the common council in the contract with Burnham and Harrison for the paving, to reserve to lot-owners the right to pay for the same in cash at $2.50 per square yard, according to the terms made with the city and contained in the proposal of the contractors. The results of this litigation demonstrate the propriety of the discrimination made by the contractors between a cash payment and a payment to be realized by an assessment and sale of the property to be charged with the expense. No good business man would probably have done otherwise than Burnham and Harrison did, and we see no impropriety in the common council having accepted the proposal as made. It was, doubtless, a well known fact, that collection of the taxes would be resisted and that litigation, delay and expense would follow, the results of which were uncertain. It was proper, therefore, for the common council to sanction the discrimination, but it should no doubt at the same time have given lot-owners the option to pay $2.50

in cash, as authorized by the proposal. This was a mistake or oversight, of which injured parties might take advantage. Had it appeared that the plaintiff in this action had tendered or offered to pay the $2.50 cash at the completion of the contract, and it had been refused, just ground of complaint and for legal or equitable redress would no doubt have been shown. As the case is now presented, however, he has suffered nothing from the mistake, and we think he is in no position to complain or take advantage of it.

*By the Court.* — Order reversed and cause remanded for further proceedings according to law.