Argued before HARDIN, P. J., and MARTIN and MERWIN, JJ.

Edward E. Dean, for appellant.

W. Martin Jones, for respondent.

HARDIN, P. J. This action was brought by an officer in his official capacity, and no execution can be issued upon a judgment recovered against him in his official capacity. Section 1931, Code Civil Proc. Such a judgment as has been entered in this action may be collected of the town for which the plaintiff, as overseer, acts. Thayer v. Lewis, 4 Denio, 273; Avery v. Slack, 19 Wend. 50; People v. Board of Sup'rs, 12 How. Pr. 50. The money deposited with the county treasurer was placed there by the informers. They are not plaintiffs in the action. No judgment has been rendered against them. The money needed to indemnify the town against any loss it may sustain by reason of being obliged to pay any judgment rendered in this action may be claimed by the town, or the officer in its behalf. Such portion of the money as shall not be needed to indemnify the town may be claimed by the persons making the deposit. In those controversies the defendant has no vested interest. Nothing is shown by the papers presented upon the motion to indicate that the defendant has not a perfect remedy for the recovery of the costs awarded to him by pursuing the usual methods to enforce judgments in such a case as this. These views, together with those suggested in the opinion of PARKER, J., at special term, lead me to advise an affirmance of the order. Order affirmed, with $10 costs and disbursements.

MERWIN, J., concurs.    MARTIN, J., not voting.

---

(5 Misc. Rep. 391.)

BOON et al. v. CITY OF UTICA et al.

(Supreme Court, Special Term, Oneida County.    June, 1893.)

INJUNCTION—RESTRAINING CITY COUNCIL FROM MAKING CONTRACT.

A city council will be enjoined, at the suit of taxpayers, from making a contract for paving streets with a specified material, which is the subject of a monopoly, though two-thirds of the abutting property owners petitioned for the use of such material, and the city charter provides that, in such case, the council has no power to contract for a different kind of pavement.

Action by Lorenzo Boon and another against the city of Utica, the common council of said city, and the members of the common council, individually, to restrain the making of a contract to pave certain streets of said city with "refined Trinidad asphaltum, obtained from Pitch lake, in the island of Trinidad," on the ground that such asphaltum was a monopoly, and not the subject of competitive bidding in said city.    Granted.

For decision on motion to dismiss appeal, see 25 N. Y. Supp. 846.

C. D. Adams, for plaintiffs.

F. M. Calder, Wm. A. Matteson, and Arthur M. Beardsley, for defendants.

VANN, J.    The plaintiffs base their right to relief in this action upon three propositions:    First, that the specifications for the paving in question required the use of a particular kind of pitch, to be obtained from a particular place; second, that none of that kind of pitch can be obtained from that place to be used for paving in Utica except by a certain company, which, having a monopoly of the material specified, is able to control prices and prevent competition; third, that a controlling majority of the common council aided and favored that company by giving it the work at an extravagant price, and practically preventing other proposed bidders, including abutting owners with special rights under the city charter, from bidding for the same.    The payment of public money upon an illegal contract, or even the making of an illegal contract upon which public money may be paid, will be restrained by the court upon the application of any qualified taxpayer, on the ground that it is an "illegal official act," tending to waste the property of the public.    Laws 1881, c. 531, as amended by Laws 1887, c. 673, and by Laws 1892, c. 301, Code Civil Proc. § 1925.    Any unauthorized combination or arrangement that tends to prevent competition in buying, selling, or using a certain article, either generally or in a particular locality, and thereby to increase the price thereof, to the detriment of the public, is, in a legal sense, a monopoly.    People v. North River Sugar Refining Co., (Cir. Ct.) 3 N. Y. Supp. 401. An agreement to pay public money to a monopoly, knowing it to be such, and intending to favor it as such, is an illegal contract, and any action in executing or performing the same is an illegal official act, within the meaning of the statute already referred to.    Warrin v. Baldwin, 105 N. Y. 534, 12 N. E. 49;  People v. Gleason, 121 N. Y. 631, 25 N. E. 4;  Talcott v. City of Buffalo, 125 N. Y. 280, 26 N. E. 263;  Ziegler v. Chapin, 126 N. Y. 342, 27 N. E. 471;  Nelson v. City of New York, 131 N. Y. 4, 29 N. E. 814;  1 Dill. Mun. Corp. 466; Dolan v. Mayor, etc., 4 Abb. Pr. (N. S.) 397;  Bigler v. Mayor, etc., 5 Abb. N. C. 51.    If, therefore, the common council of the city of Utica, either through artfully-drawn paving specifications, or by any other official act, entered into contract, or attempted so to do, in the name of the city, with a monopoly, to the actual or practical exclusion of all competition, its action was in violation of law, and calls for interference by the courts.

It is necessary to inquire what the city charter authorized to be done, as well as what was in fact done, by the common council, in order to discover whether it bound, or tried to bind, the city in contract with a monopoly. The method of procedure prescribed by the charter, with reference to the pavement of streets, is substantially as follows: When the common council shall have determined to pave any street, it becomes its duty to give notice through the official newspaper that on a day specified it will determine the kind of pavement to be laid. If, on or before that day, the persons liable to be assessed for two-thirds of the frontage on that part of the street that is to be paved shall, in writing, express their choice of any particular kind of pavement to be laid, the common council has no power to contract for a different kind. City Charter, § 99. Before the passing of any ordinance for the purpose of causing a street to be paved, plans and specifications of the work proposed to be done must be prepared under the direction of the council, and filed with the city clerk. Notice of such filing is thereupon given by publication, and also that sealed proposals for constructing the work, with bonds for the faithful performance thereof, will be received by the mayor up to a specified time, when action thereon is to be taken by the common council. No proposal can be considered unless accompanied by a bond with sureties, and in a penalty to be approved by the common council, conditioned that, if the proposal is accepted, the person making it will construct the work at the price and upon the terms proposed, according to the plans and specifications, and subject to the supervision and approval of such person as the common council may designate for the purpose. The further condition is also required in the bond that the contractor will take all suitable precautions to prevent injury to persons or property as the work progresses, and that he will save the city harmless from all losses arising through his negligence. When the proposals are opened, it is the duty of the common council to determine which is the most favorable, and it may then accept the same, and direct the construction of the work. No formal agreement or contract in writing between the city and the contractor seems to be contemplated by the charter, but by the action already mentioned the contract is completed, subject to the veto power of the mayor, and provided that no further action is taken at the next meeting of the council. At that meeting, however, one or more of the persons liable to be assessed for the work may propose to do the same at an expense of at least 15 per cent. less than the proposal declared most favorable, but he must tender bonds therewith in the same form as those required at the first bidding. If such a proposal is made, the statute commands that "the work shall be let to the person or persons last proposing, provided, however, that all of said propositions are not deemed unreasonable." If the contract is let, and the work done, two-thirds of the expense thereof is assessed upon the abutting owners, according to the frontage owned by each, while the remaining third is paid by general assessment upon all the taxable property in the city. This carefully-drawn statute presents two features worthy

of especial attention in this case: First. It permits the active participation of lot owners in the proceedings to pave the street in front of their premises, by authorizing them to determine the kind of pavement to be laid. While they cannot compel the common council to pave, they can compel the use, when the street is paved, of the particular kind of pavement that is satisfactory to two-thirds of their number. Second. Another peculiar feature is that it not only invites competitive bidding between contractors generally, but, after their bids are made public, it authorizes further competition, limited to the lot owners themselves, upon the basis of a reduction in price of not less than 15 per cent. below the most favorable proposal of the general bidders. This is a protection against unreasonable prices, whether they arise from a combination among contractors, or from any other cause. Thus, these two provisions enable the lot owners, by appropriate concert of action, to decide upon the kind of pavement, and should enable them to get it laid at a reasonable rate, leaving to the city authorities the power to determine whether the street is to be paved or not, and the duty of attending to the various administrative details.

In the spring of 1892, the common council determined to pave South street, Sunset avenue, and several other streets in the city of Utica, all of which are the subject of controversy in this action. While the proceedings were not precisely the same in the case of each of said streets, the method of procedure was substantially the same, so that, unless otherwise mentioned, the effort to pave will be treated as if made in a single proceeding to pave a single street. Rutger street had been paved in 1886 with asphalt pavement, and the result seemed satisfactory to the citizens, for in 1888, when upper Genesee street was paved, the lot owners not only designated "Trinidad asphalt street pavement, the same kind laid on Rutger street," but even petitioned the common council to reconsider its action in awarding the contract to the lowest bidder, asking that it be awarded to the Warren-Scharf Paving Company, the same that had paved Rutger street, which was accordingly done. Subsequently, the same designation was used in the case of other streets, thus indicating a decided preference on the part of lot owners for the kind of pavement in use on Rutger street. This is significant, in view of the fact that in the mean time other experiments in asphalt paving had been made that were not regarded as satisfactory. After the common council had determined to pave the streets in question, and in March, 1892, lot owners representing the requisite frontage designated "Trinidad asphalt street pavement" as the kind they wished to have laid, adding that the variety of asphalt to be used should be "the same as that used in the pavement laid on Rutger, Genesee, and Columbia streets." The usual action was thereupon taken by the common council, and specifications were prepared, requiring the use of "the best quality of refined Trinidad asphaltum, obtained from Pitch lake, in the island of Trinidad." After duly advertising, proposals were received, and the bid of the Warren-Scharf Asphalt Paving Company, which was based upon said specifications, was declared the most favorable, although it

was not in fact the lowest. At the next meeting of the common council a qualified lot owner proposed to do the work for 15 per cent. less than the bid so accepted, and to use "the best quality of the refined Trinidad asphaltum, obtained from the island of Trinidad." In the mean time, petitions from the lot owners had been presented, requesting the common council to award the work to the Warren-Scharf Company, stating that they wanted no experimental or worthless paving laid, and claiming that any bid was illegal that did not conform to the designation of the taxpayers and the specifications of the city surveyor. The question was raised whether the taxpayer's proposal conformed to the specifications; and, a written opinion of the corporation counsel having been presented, holding that it was irregular because it did not specify the particular kind of asphalt required by the specifications, all of the proposals were declared unreasonable, and a new determination to pave adopted. The lot owners thereupon filed new designations, specifying "Trinidad Pitch Lake asphalt pavement" as the kind they wished to have laid, and new specifications were prepared, requiring the use of "the best quality of refined Trinidad asphaltum, obtained from the Pitch lake, in the island of Trinidad." Notice was given through the official newspaper that bids to do the work would be received until June 3, 1892, at 7:30 P. M.; but, before that hour arrived, this action was commenced, and a temporary injunction granted therein, restraining the corporate authorities from making a contract to pave any of said streets with a pavement made in part out of "the best quality of refined Trinidad asphaltum, obtained from Pitch lake, in the island of Trinidad," upon the ground that that article was a monopoly, and could not be obtained in the open market. June 3d, the proposals that had been presented were opened, and those made by the Warren-Scharf Company, which was the only bidder, were declared the most reasonable. At the same meeting the corporation counsel was directed to move to vacate the injunction at the earliest day possible. The motion, having been made, was denied, and on the 1st day of July, 1892, all proceedings in the matter of paving the streets in question were discontinued, and new proceedings were begun. The property owners, to the number required by the charter, again designated "Trinidad Pitch Lake asphalt street pavement," and stated that this was "the kind of asphalt used on Rutger, Genesee, and Columbia streets." They also called the attention of the common council to their previous petitions upon the subject, on file with the city clerk, and annexed printed copies of the same to the designations. The common council thereupon determined upon asphalt sheet pavement as the kind to be laid, and directed the city surveyor to prepare specifications requiring bidders to state in their proposals the kind of asphalt they intended to use, and the place from which it was to be obtained. The specifications prepared this time required the use of "the best quality of refined asphaltum," without naming the particular kind, or the locality from which it was to be obtained, and bidders were not required by the specifications to specify either the kind or locality in their proposals. The specifications, however,

contained the following clause: "It is intended that the contractor shall furnish and employ only the best quality of asphalt for paving purposes that can be obtained." The word "Trinidad," as it had appeared in the specifications previously prepared, was stricken out, and also the clause requiring the asphalt to be obtained from "the Pitch lake, on the island of Trinidad." The contractor was required to warrant "the materials and workmanship employed * * * to be of such character that the pavement shall be and remain in as perfect condition during the period of five years as the best asphalt pavements heretofore laid in the city of Utica." The city engineer was to determine as to the quality of the materials and the sufficiency of the work, but acceptance of the pavement was not to impair said warranty. Notice was given, in the usual way, that bids would be received until July 27th, at 7:30 P. M., and that final action would then be taken. As no time had been named in the specifications for the completion of the work, the notice provided that it was to be completed on or before October 31, 1892. Proposals to do the work were received from the following bidders, at the prices written opposite their names, respectively: James J. Dwyer, at $2.38 per square yard; John Marsden, at $2.65 per square yard; the Warren-Scharf Asphalt Paving Company, at $2.81 per square yard; the Sicilian Asphalt Paving Company, at $2.84 per square yard. The kind of asphalt to be used and the place from which it was to be obtained were thus described: By Mr. Dwyer: "The best quality obtained from the Pitch lake, situated in Bermudez, Venezuela, S. A., and to contain 95 per cent. bitumen." By Mr. Marsden: "Refined Trinidad asphalt, equal to any brought from the island of Trinidad." By the Warren-Scharf Paving Company: "The best quality of refined Trinidad Pitch Lake asphalt, to be obtained directly from the well-known Pitch lake, on the island of Trinidad, W. I." By the Sicilian Asphalt Paving Company: "The best quality of asphalt obtained from the Pitch lake, in the island of Trinidad." A bond accompanied each proposal, conditioned that the contractor should do the work at the price named, according to the plans and specifications, and subject to the supervision and approval of the city surveyor, and specifying a certain sum to be paid to the city as liquidated damages in case of nonperformance of the paving contract. The sum so specified by the Warren-Scharf Paving Company was the highest, and it was the only bidder whose bond in terms covered the warranty of the work, as required by the specifications. Its proposal was declared favorable and reasonable by a vote of eight to four, a motion to substitute the proposal of Mr. Dwyer having been lost by a like vote. The next meeting of the common council was held on the 5th of August, when certain proposals to do the work were received from qualified taxpayers at from 15¼ to 15½ per cent. less than the bid accepted at the previous meeting. These proposals were declared informal and unreasonable; some of them because they contemplated the use of Bermudez asphalt, which, in the language of the resolution, had "never been used on any street, and therefore was not proved to be the best asphalt for which the specifications provide, and that it is for a

kind of asphalt different from that for which the contract awarded to the Warren-Scharf Asphalt Paving Company provides and contemplates, changing the conditions of said contract." The other proposals were rejected because they did not state "the kind of asphalt proposed to be used, and whence obtained, as required by the specifications." The various resolutions, both those awarding the contract to the Warren-Scharf Paving Company by declaring their proposals reasonable, as well as those rejecting the proposals of the taxpayers by declaring them unreasonable, were all vetoed by the mayor, but the vetoes were overruled by the vote of two-thirds of all the aldermen composing the common council. The taxpayers thereupon renewed their proposals, in substantially the same form as before, to do the work at from 15$\frac{1}{4}$ to 15$\frac{1}{2}$ per cent. less than the proposal of the Warren-Scharf Paving Company, but the common council declared them informal and insufficient "for the following reasons, among others: First. That the proposal does not conform to the specifications in that it does not state the kind of asphalt proposed to be used, and from whence obtained. Second. That the proposal does not conform to section 18 of the specifications, in that it does not contain a warranty of the material and workmanship, and that the pavement to be laid shall remain in as perfect condition, during the period of five years, as the best asphalt pavement heretofore laid in the city of Utica. Third. That the bond accompanying said proposal is defective, in that it does not cover a warranty of the work, as provided by section 18 of the specifications. Fourth. That the amount of liquidated damages stated in said bond is not approved, and should be at least,"—a different sum being named for each street. "Fifth. That no certified check for ten per cent. of the estimated cost of the work has been deposited, as required by a resolution of the common council." It was also resolved "that further action in the matter of paving [the streets in question] be postponed to the next meeting of the common council, and that [the bidder named] have until Friday next, September ninth, in which to amend his said proposal and bond in the particulars above set forth, and file the same and certified check as required, and with an agreement to complete the work by October 31, 1892, with the city clerk." The city clerk was directed to serve a certified copy of the resolution upon the various bidders on or before September 7th, at 6 P. M., and service was made accordingly; but the proposals of the taxpayers were not amended, nor was any attempt made to conform to said resolution.

As the specifications provide for a warranty, a proposal to do the work according to the specifications was a proposal to do the work with the warranty therein contained. The common council had not fixed the amount of the liquidated damages to be inserted in the bond, and the specifications were silent upon the subject, so that bidders had nothing to guide them in that regard. In August, 1890, a resolution was adopted by the council directing the city surveyor to "add to the specifications to be filed with the city clerk an estimate of the cost of the work, and the bidders be required to deposit with their proposals a certified check for ten per cent. of

the estimated cost;" but no notice of this appeared in the specifications in question, although there was indorsed upon them the word "estimate," followed by the amount thereof in dollars and cents. The raising of so many technical objections, which was not usual with the common council, and some of which, at least, were untenable, gives support to the charge that the aldermen were trying to embarrass and tire out the taxpaying bidders in the interest of the Warren-Scharf Company. This charge is also illustrated by a resolution, adopted quite early in the proceedings to pave these streets, directing the surveyor "to include in the specifications for asphalt pavements a clause requiring an affidavit from the company who imports the asphalt to the effect that the bidder has made arrangements for a supply of asphalt in sufficient quantity to complete the work, and of the quality." The various resolutions of the council with reference to paving the streets in question, aside from the mere determination to pave and the like, were, with one or two exceptions, adopted by a vote of eight to four, the same aldermen. uniformly constituting the majority and the minority. The mayor interposed his veto power with like uniformity, and there was a long struggle, covering a period of more than six months, between the majority of the council on the one hand, and the mayor and the minority of the council on the other. The majority were of the opinion that only asphalt from Pitch lake should be used, because two-thirds of the taxpayers wanted that kind, and no other, while the minority claimed that the particular quality of asphalt was controlled by the Warren-Scharf Paving Company and its confederates, and hence that competitive bidding would be impossible if limited in this way. As early as April the mayor had said, in an official communication to the council, that "the charter contemplates competition. The specifications as now drawn, with the words 'Trinidad asphalt from Pitch lake,' entirely crush it out, for it has come to our knowledge recently, and in such a way as not to be disregarded, that this kind of asphalt can only be procured by one party here bidding, which is equivalent to saying to this one party, 'Go on and do the work at your own prices, and hand in your bill.'" After the temporary injunction was granted, the specifications were modified, but in such a way as, in the light of all the surrounding circumstances, indicated simply an attempt to evade the order of the court by indirectly accomplishing the same purpose. Great care was taken to keep control of the subject, so that Pitch Lake asphalt, only, should be used. The history of the attempt to pave these streets, with the numerous discontinuances, renewals, and changes, shows an unmistakable intention on the part of the majority to use that kind of asphalt at all hazards. Owing to the action of the taxpayers in making the designations, the common council had the right to insist upon the use of asphalt from Pitch lake, if they did it in good faith; and their motives are not here impugned, provided that kind of asphalt was not a monopoly. I am compelled, however, after a careful study of the evidence, to find, contrary to my first impressions upon the subject, that Pitch Lake asphalt was practically a monopoly for paving

purposes in the city of Utica at the time when the various proposals were made. It can be readily purchased in small quantities, and at reasonable prices, for use in the arts, but it cannot be purchased in large quantities, at reasonable prices, to be used and as required for paving purposes, in any place where the Warren-Scharf Paving Company has a plant established to do paving work, as is the case in Utica. While a direct refusal to sell may not be made, as shrewd management forbids such an open course, either by professing that it has not on hand in sufficient quantities, or by asking unreasonable prices for it, or by requiring a contract for five years, or by some other evasion, those who control the importation effectually prevent any person or corporation, except that particular company and its allies, from obtaining it for use in paving in Utica. Even if it had been possible for a person to import the crude asphalt and refine it himself, the time required for the purpose would have made competition with the Warren-Scharf Company at Utica practically impossible at the dates under consideration. During the protracted controversy already alluded to, the main point of difference between the contending interests was whether Pitch Lake asphalt was a monopoly or not, and, although the subject obtained wide publicity, no one appears to have offered to sell or furnish that kind of asphalt for paving in Utica at any price. Such an offer, at a reasonable price, from a responsible party, would necessarily have quieted the contention by demonstrating that the alleged monopoly did not exist. The Warren-Scharf Company, although active in preparing petitions to be signed by the taxpayers, and resolutions to be adopted by the common council, in its interest, took no step to enlighten the public or the corporate authorities upon this vital point. While it was under no obligation to do so, its silence, under the peculiar circumstances, is not without significance. Although different companies pave with Pitch Lake asphalt, they do not compete with each other, but each, taking a district comprising certain territory, confines itself to that locality. Whether this is by express or implied agreement, or without any agreement at all, makes no practical difference, for the result is to fasten a monopoly in Pitch Lake asphalt upon the city of Utica. While good asphalt pavement can be laid out of asphalt not obtained from Pitch lake, I do not regard the fact as of importance in this case, because the abutting owners had the right to designate the kind of pavement, including, as a necessary part thereof, the kind of asphalt out of which it should be made. Although the common council could not, under the circumstances, lay any other kind, it was their duty, upon learning that the kind designated was for all practical purposes a monopoly, to refuse to lay any at all until the designation was changed or the monopoly ended. Their persistent endeavor to force Pitch Lake asphalt upon the city at an increase in expense of from $15,000 to $25,000 was illegal, even if they acted from good motives, and in the honest belief that the wishes of abutting owners must control. Two-thirds of the lot owners cannot control to the extent of forcing a monopoly upon the other third, as well as upon the general taxpayers,

who pay one-third of the expense of all pavements.   The one-third of the cost represented by the one-third of nonassenting lot owners, when added to the one-third paid by the city at large, shows the large interest affected by the monopoly, and in no wise consenting thereto.   The members of the common council represented, and should have adequately protected, all interests,—not only the two-thirds, who petitioned for Pitch Lake asphalt, but also the remaining third, who did not so petition, as well as the great body of taxpayers who, taking no especial interest in these streets, had regard to the general welfare of the entire city.   The majority of the aldermen did not do their duty in the premises, not from a fraudulent or furtive purpose, as I think, but owing to a narrow and mistaken conception of what their duty was.   Harlem Gaslight Co. v. City of New York, 33 N. Y. 309; Dean v. Charlton, 23 Wis. 590; State v. City of Elizabeth, 35 N. J. Law, 351; Pavement Co. v. Painter, 35 Cal. 699.   Without further protracting this discussion, I am of the opinion that the plaintiffs are entitled to a permanent injunction, substantially in the form demanded in their complaint, with costs to be paid by those members of the common council whose action made it necessary to resort to the court for relief. Findings and a decree may be prepared accordingly, by the attorney for the plaintiffs, and settled before me upon a notice of two days to the attorney for the defendants.   Decree accordingly.