WORTHINGTON *et al. v.* CITY OF BOSTON.

*(Circuit Court, D. Massachusetts.* January 11, 1890.)

1. MUNICIPAL CORPORATIONS—CONTRACTS.
    A city ordinance, establishing a water board, provided that the board should make no contract or purchase involving an expenditure of more than $10,000 without first advertising for bids. Afterwards the city council passed an order authorizing the board to exchange certain pumping-engines. *Held,* that an exchange made without advertising for bids, at an expenditure of more than $10,000, was not binding on the city, the order not abrogating the terms of the ordinance.

2. SAME.
    Nor did the fact that the pumping-engines to be procured in such case were patented relieve the board from the necessity of advertising.

At Law.

This is an action to recover damages for an alleged breach of contract, dated May 19, 1885. By this contract the plaintiffs were to furnish two high-service pumping-engines for the city of Boston for the sum of $106,-575. The city of Boston refused to receive the engines on the ground that the Boston water board, through whom the contract was made, had no authority to make any contract involving more than $10,000 without first advertising for proposals, which was not done in this case. It is admitted that the damages sustained by the plaintiffs, if the defendant is liable on the contract, are $35,000. The case can be better understood by referring to some portions of the agreed statement of facts.

The city of Boston was, previous to 1875, and ever since has been, authorized to take water from Lake Cochituate, (called, also, "Long Pond,") Sudbury river, and Mystic lake, build and maintain aqueducts, dams, reservoirs, lay pipes, establish hydrants, and supply its inhabitants with water, in such manner, and by such agents, officers, and servants, as the city council shall from time to time ordain, appoint, and direct, and previous to the year 1875 had established the Cochituate water board and the Mystic water board to exercise these powers, subject to the ordinances and orders of the city. Chapter 80 of the Statutes of Massachusetts for the Year 1875, so far as it is material in this case, is as follows:

"The city council of the city of Boston may establish by ordinance a water board, to be known as the 'Boston Water Board,' consisting of three able and

discreet persons, to be appointed by the mayor, with the advice and consent of the city council, and to receive such compensation as the city council may from time to time determine. The said board may be empowered by said city council to exercise all or any of the powers conferred by the statutes of the commonwealth upon the city of Boston with reference to supplying said city with water, or of the Cochituate and Mystic water boards, and also to act as the agent of the city of Boston in doing any or all things which the city is now authorized to do in relation to the taking of lands, water-rights, and other property, and the establishment and maintenance of works and appliances for supplying the city of Boston or other cities and towns with pure water; * * * and the said Boston water board shall, so far as the city council of said city may by ordinance prescribe, succeed to all the powers and duties formerly vested in said Cochituate water board and Mystic water board."

The city council of said city, with the approval of the mayor, on the 22d day of March, 1876, passed an ordinance, which continued in force until after the time of making the contract declared on, the parts of which material to this case are as follows:

"There shall be a board to be known as the 'Boston Water Board,' and to consist of three members. Said board shall have and exercise all the powers, so far as such powers can be legally delegated by the city council, which were granted to the city by, or are held by the city under, chapter one hundred and sixty-seven of the Statutes of the Commonwealth of the Year Eighteen Hundred and Forty-Six, chapter one hundred and seventy-seven of the said Statutes of the Year Eighteen Hundred and Seventy-two, and by or under any and all statutes in addition to either of the before-mentioned chapters; subject, however, to the authority of the city council, from time to time, by ordinances, orders, or resolutions, to instruct said board, and to change and limit their powers. Such board may, subject to the approval of the mayor, sell or lease such of the property connected with the water-works as they deem expedient, and all necessary deeds and leases shall be executed by the mayor, and countersigned by the chairman of said board. No contract or purchase which is estimated to involve an expenditure of more than ten thousand dollars, except a contract for the laying of pipe, shall be made by the said board until they have advertised, as hereinafter provided, for sealed proposals therefor. When advertisments for such proposals are made, plans and specifications of the work to be done, and schedules of the materials or supplies to be furnished, shall be placed on file in such office as may be designated by said board, and shall at all times during office hours be open to public inspection. The advertisement shall in all cases be inserted not less than five times in each of three newspapers published in the said city, and it may be inserted also, if said board deem it expedient, in newspapers of other cities or towns, and the last publication shall be at least one week before the time fixed for opening the proposals. Each proposal shall conform to the specifications and requirements of the advertisement, shall be inclosed in a sealed envelope addressed to said board, and shall be accompanied by a bond to the city, with sufficient sureties, in such sum, not less than five hundred dollars, as said board may specify in their advertisement, and conditioned to be void if the party making the proposal shall, in case of the acceptance of his bid, sign and deliver to said board, within the time required in their advertisement, a contract for the performance of the subject-matter of his proposal; and if he shall also, at the time of the delivery of such contract, give a further bond, with satisfactory sureties, for the performance of such contract. But, instead of the before-mentioned bond to accompany a proposal, a deposit of money or other collateral satisfactory to said board may be made as security for the sign-

ing and delivery of the contract, and of the bond for the performance thereof. For the performance of the contract, a bond, with sureties, shall in all cases be required when the contract is signed and delivered. All proposals shall be publicly opened at the time and place designated in the advertisement, and the said board may reject any or all bids which are offered, and it shall be their duty to reject the bids of all irresponsible parties."

The Cochituate water department comprises that part of the city water-works which is employed in supplying the city with water from Lake Cochituate and Sudbury river to Chestnut Hill reservoir, the aqueducts from said sources to, and the pipes supplied from, the reservoir, and the pumps, machinery, etc., appurtenant thereto, and for several years prior to 1884 the matter of extending the high-service works of the Cochituate department was before the city council. In 1881, the Boston water board submitted to the city council an estimate of the cost of such extension, amounting to $743,600. On November 17, 1884, the board submitted to the city council another estimate of the cost of such extension, amounting to $765,600. ' On December 23, 1884, the following order, duly passed by the city council, was approved by the mayor:

"Ordered, that the city treasurer be authorized to borrow, under the direction of the committee on finance, and at such a rate of interest as they shall determine, the sum of $766,000, which sum is hereby appropriated, and the Boston water board is authorized to expend the same for the extension of the high-service works of the Cochituate water department."

On December 31, 1884, the city engineer, Henry M. Wightman, addressed to the water board a letter, in which he said:

"The board should determine the pumping-engine it will use; as such determination is necessary before a plan of the pumping station can be made. I am of the opinion that the improved Worthington engine will prove the most advantageous for the city; and as a three million gallon engine of this type is running at the Worthington pump-works in New York, it would be advisable for the board to examine this engine before any decision is made."

The water board adopted plans and specifications for said extension, requiring, among other things, two engines of the daily capacity of five million and ten million gallons, respectively, estimated by said board to cost from $85,000 to $93,000, the discontinuance of the pumping station on Elmwood street, at the Highlands, and the engines and machinery therein; and on the 3d day of April, 1885, the Boston water board sent the following communication to the city council:

"The plans for the extension of high service, as detailed by ex-City Engineer Joseph P. Davis, and the late city engineer, Henry M. Wightman, require the establishment of a new pumping station at Chestnut Hill, of larger capacity than the present one, at the Highlands, and the discontinuance of the latter. Mr. Wightman, after a careful examination of the matter, concluded that it would be advantageous for the city to exchange, if possible, the small engines now in use for the larger ones required in the extension of the high service, and so recommended to the board. We therefore ask 'that the water board be authorized to exchange such pumping engines and machinery as are inadequate, or of insufficient capacity, for those of the capacity required by the plans and estimates of the new high-service extension.' "

On April 20, 1885, the following order, prepared by the chairman of the water board, and which had duly passed both branches of the city council, was approved by the mayor:

"Ordered, that the water board be authorized to exchange such pumping engines and machinery as are inadequate, or of insufficient capacity, for those of the capacity required by the plans and estimates of the new high-service extension; the expense of such exchange to be charged to the appropriation for high-service extension."

The water board never advertised in any manner for proposals for contracting for or furnishing the engines, boilers, and appurtenances required by the plans and specifications for the new high-service extension. On April 24, 1885, the board received from the plaintiffs a proposal to furnish and erect the pumps for $106,575, and on the same day the board voted to accept, and did accept, the proposal. The distinguishing characteristic of the improved or high-duty Worthington engine is a patent "high-duty" attachment, the patent of which is owned and used exclusively by the plaintiffs. The plaintiffs, with knowledge of the ordinance hereinbefore cited, requiring advertisements, were informed by the chairman of the Boston water board that the order above cited of April 20, 1885, avoided any necessity of advertising in this case; and on May 19, 1885, the Boston water board, in the name of the defendant, and claiming to act in its behalf, and whose whole authority in the premises, if any it had, was derived from the orders, ordinances, and statutes as hereinbefore stated, and the plaintiffs, entered into a contract, the material portions of which were that said plaintiffs should make and erect at Chestnut Hill reservoir two high-duty pumping-engines,—one of ten million and one of five million gallons daily capacity,—and the boilers and appurtenances for the same; that the defendant should pay the plaintiffs therefor the sum of $106,575; and the pumping machinery, boilers, and all their appurtenances then located in the Highland pumping station, and valued at $3,500, were to become the property of the plaintiffs. On the same date a bond in the sum of $25,000, with sureties, running to the city of Boston, was delivered to the Boston water board to secure the faithful performance of the contract by the plaintiffs. The bond was accepted for the city of Boston by the Boston water board, and attached to the contract, and is now in the possession of the city auditor. In the year 1877, the Boston water board and Henry R. Worthington contracted for an engine, at a cost of $20,000, without advertising therefor, and the price stipulated therein was paid by said city.

*Ambrose A. Ranney* and *William R. Howland,* for plaintiffs.

*Andrew J. Bailey,* City Solr., for defendants.

COLT, J., (*after stating the facts as above.*) Upon the foregoing statement of facts, the question is presented whether the city of Boston is liable on the contract made by the water board with the plaintiffs. On behalf of the city, it is insisted that the powers of the board are limited by the terms of the ordinance; that the ordinance requires the board to advertise for proposals where the contract involves an expenditure of more

than $10,000; and that, the board having neglected to do this, the contract made was not the contract of the city, and is not binding upon it. As a general legal proposition, this is sound, and supported by authority. *Brady* v. *Mayor*, 20 N. Y. 312; *Mayor* v. *Eschbach*, 18 Md. 276; *Dibble* v. *New Haven*, 56 Conn. 199, 14 Atl. Rep. 210; *The Floyd Acceptances*, 7 Wall. 666; *Bank* v. *Winchester*, 8 Allen, 109; *Palmer* v. *Haverhill*, 98 Mass. 487; *Petitions of Eager*, 46 N. Y. 100; *Pavement Co.* v. *Painter*, 35 Cal. 699; *Zottman* v. *San Francisco*, 20 Cal. 96; *Dean* v. *Charlton*, 23 Wis. 590.

Is there anything in the special facts of this case to take it out from the operation of the general rule? The contention of the plaintiffs is that the order of April 20, 1885, which passed both branches of the city council, and was approved by the mayor, and which authorized the exchange of pumping-engines to be made, gave the board authority to make the exchanges without advertising for proposals. If this were otherwise, it is said that it would have been a foolish and unnecessary act to have passed any such order. It is also pointed out that the ordinance provides that the city council may from time to time, by order or resolution, instruct the board, and change and limit their powers; and it is claimed that the council, acting under this provision, passed the special order of April 20th, with the intention of taking this particular transaction outside of the operation of the general ordinance. This line of argument has some force, but I do not think it should prevail in this case for the following reasons: If we turn to the ordinance, we find that the board may, subject to the approval of the mayor, sell or lease the property connected with the water-works, as they may deem expedient. Here was a case, however, where property was to be exchanged; and the board might well say: "While we have the power, subject to the approval of the mayor, to sell or lease the property of the water-works, we have no specific authority conferred on us to exchange such property; and therefore, in order that no question may arise as to our power to act in the premises, we will obtain an order from the city council." It seems to me that the proper construction to give to the order of April 20th is that it was passed to supply any possible deficiency in the power of the board to make the proposed exchange, and that it was not designed as a special ordinance, to be acted upon outside of, and independently of, the provisions of the general ordinance. Upon no sound principle of statutory construction can it be said that the act of April 10th operated to repeal the general ordinance relating to the powers of the board. So far as it changed or repealed the ordinance, it should be held to be operative. So far as it did not change or repeal the ordinance, its provisions remain in full force and effect. I am of opinion, therefore, that the act of April 10th was not intended to, and did not, relieve the board from the necessity of advertising for proposals in this case.

The second ground upon which the plaintiffs base their right of recovery is that, the Worthington pump being patented, there was no necessity to advertise for proposals. I do not think, however, that the circumstance that the Worthington pump embodied an attachment which

was patented, relieved the board from the necessity of advertising. In the cases referred to by the plaintiffs, ( *Yarnold* v. *City of Lawrence,* 15 Kan. 126; *Hobart* v. *Detroit,* 17 Mich. 246; *Attorney General* v. *Detroit,* 26 Mich. 263; *In re Dugro,* 50 N. Y. 513,) we find that an advertisement for bids was made in each instance, except in the case of *Yarnold* v. *City of Lawrence,* and there the court held that by the terms of the statute the city was not required to advertise. The form in which this question has usually been presented, and upon which there is a conflict of authority, is whether a city has a right to avail itself of a patented invention in the improvement of its streets, where the law requires the letting of contracts to the lowest bidder. Upon this question the adjudications are not uniform, as will be seen by comparing the cases already cited with the following: *Pavement Co.* v. *Painter,* 35 Cal. 699; *Zottman* v. *San Francisco,* 20 Cal. 96; *Dean* v. *Charlton,* 23 Wis. 590; *Burgess* v. *City of Jefferson,* 21 La. Ann. 143. The ground upon which the courts hold that the city has no right to accept a patented article, where the law requires a letting to the lowest bidder, is that the law means that there should be a competition among bidders, and that in the case of a patented invention there is no competition.

It is urged by the plaintiffs that by the terms of the ordinance the board were not obliged to accept the lowest bidder; and therefore, having determined upon the Worthington pump, it was useless to advertise for bids. However this may be in this particular case, I think it would be a dangerous principle to establish that, because one feature of an article which the city desired was patented, the board thereby can waive the requirement of advertising, and the advantages of publicity, and secretly make their own selection. Even though a thing may be patented, it may form a subject of competition, because there may be numerous licensees under the patent. The ground upon which I decide against the plaintiffs on this point is that the ordinance obliged the board to advertise for proposals, and that it was beyond their power to waive or dispense with this requirement, and that therefore the contract which was made, and upon which the plaintiffs rely, was void. Judgment for defendant.