DRAINAGE COMMISSION OF NEW ORLEANS v. NATIONAL CONTRACTING CO. OF NEW YORK et al.

(Circuit Court, E. D. Louisiana. June 25, 1904.)

Nos. 13, 134.

1. MONEY PAID—STATUTES—CONSTRUCTION.
   The word "knowingly," as used in' Civ. Code La. art. 2301 (2279), providing that he who receives what is not due to him, whether through error or knowingly, obliges himself to restore it to him from whom he has unduly received it, does not imply necessarily the idea of wrongdoing or bad faith, but means only "with knowledge."

2. CONTRACTS—SUBSTITUTION OF MATERIAL—PROFITS—RECOVERY—DEFENSES—ESTOPPEL.
   Where a contractor for public work supplied a cheaper material than that specified, and thereby made an improper profit, it was estopped to say, when sued for the return of such profit, that the cheaper material was as good as the other.

3. SAME—STATUTES—ACTIONS—NATURE AND FORM.
   Where a contractor for a public improvement substituted a cheaper material than that specified, and thereby made an improper profit, the public commission in charge of the improvement was entitled to recover such profit, under Civ. Code La. art. 2301 (2279), providing that he who receives what is not due to him, whether through error or knowingly, obliges himself to restore it, and article 2302 (2280), declaring that he who has paid through mistake, believing himself a debtor, may reclaim what he has paid, in an action condictio indebiti, and was not limited to the remedy of an action quanti minoris.

4. SAME—PUBLIC AGENTS—AUTHORITY—PRESUMPTION.
   Where the engineer of a drainage commission consented to the substitution of a cheaper material by a contractor for that specified, the contractor was not entitled to presume that either the engineer or the commission were acting within the scope of their duty.

**5. SAME—EXECUTED CONTRACT.**

Where a contractor, under a contract with a drainage commission, made a large profit by substituting cheaper materials for those specified, the fact that the contract was executed did not prevent the commission from recovering such profit.

**6. SAME—ULTRA VIRES.**

In an action by a drainage commission to recover profits wrongfully made by a contractor for a public improvement by substituting cheaper materials for those specified, the defense of ultra vires was not available.

**7. SAME.**

In an action to recover profits wrongfully made by a public contractor by substituting cheaper materials for those specified, it was no defense that the contractor lost money by performing the work.

**8. SAME—PUBLIC AGENTS—AUTHORITY.**

Acts La. 1896, p. 162, No. 114, created a drainage commission to provide a drainage system for the city of New Orleans, and ways and means for the issuance and payment of bonds therefor. Section 5 declared that all work done, or supplies or materials ordered by the commission, except emergency work, should be let by contract to the lowest responsible bidder on sealed proposals after 30 days' advertisement on approved specifications, etc.; section 6 authorized issuance of bonds, and declared that all funds dedicated by the act should be consecrated to the payment of principal and interest on the bonds; and section 7 provided that the provisions of the act should constitute a contract with the holders of the bonds which should not be impaired, and might be enforced by mandamus or otherwise. *Held* that, under such sections, neither the drainage commission nor its engineer had any power to consent to the substitution of a cheaper material for that specified in a contract.

**9. SAME—CONTRACTS—CONSTRUCTION.**

Where a contract for the construction of a public improvement specified that the "best quality of imported Portland cement" should be used, the contract could not be satisfied by the use of any sound imported Portland cement which would have filled the three special requirements as to tensile strength, fineness, and weight.

## On Motion for New Trial.

This was an action at law brought by the drainage commission of New Orleans against the National Contracting Company of New York, and its surety, the Fidelity & Deposit Company of Maryland, in solido, to recover $60,000 alleged to have been overpaid by the plaintiff to the National Contracting Company on certain contracts for drainage work, the sum claimed being the difference in cost between certain Portland cement which the contractors were required to furnish and certain cheaper American Steel cement substituted by the contractors with the consent of the engineer of the drainage commission. At the trial the court directed a verdict in favor of the Fidelity & Deposit company, and submitted the case to the jury as to the National Contracting Company. The jury returned a verdict against the defendant for $28,390. A motion for a new trial having been made, the same was overruled.

Carleton Hunt, Omer Villere, and P. S. Gidiere, for the Drainage Commission.

Farrar, Jonas & Kruttschnitt, for National Contracting Company.

P. M. Milner, for Fidelity & Deposit Co.

PARLANGE, District Judge (after stating the facts). Because of the public importance of the questions involved in this cause, I have reviewed again very carefully all the matters of law and fact which it presents.

It is obvious to me that this action lies under the plain textual provisions of the Louisiana Civil Code, "Of the Payment of a Thing Not Due," article 2301 (2279) to article 2314 (2292). Article 2301 (2279) provides that "he who receives what is not due to him, whether he receives it through error or knowingly, obliges himself to restore it to him from whom he has unduly received it." Article 2302 (2280) provides that "he who has paid through mistake, believing himself a debtor, may reclaim what he has paid." It is plain that he who receives money not due him must return it, whether or not he knew that the debt was due him. The word "knowingly," in article 2301 (2279), does not necessarily imply the idea of wrongdoing, as it would in criminal pleading, but is the translation of the French word "sciemment," meaning only "with knowledge," and not implying necessarily either bad faith or wrongdoing. Bad faith in such an action as this is only important as affecting the quantum of the recovery. Article 2311 (2289) et seq. The Louisiana Civil Code also provides that "every payment presupposes a debt. What has been paid without having been due, is subject to be reclaimed." Article 2133 (2129).

This action is not an innovation of the Louisiana Civil Code, but was taken from the Code Napoleon, article 1376 et seq., and article 1235. It is treated of at great length by Pothier, vol. 4, p. 129 (Paris Ed. of 1835), and is the action condictio indebiti of the Roman law, founded, as Pothier, the Roman jurisconsults, and the French commentators tell us, on the maxim of Roman jurisprudence, which has been made a textual provision of the Louisiana Civil Code (article 1965 [1960]), "that no one ought to enrich himself at the expense of another." See Demolombe (Paris Ed. 1882) vol. 8, p. 199. The action is not confined to money received under any particular contract. Its rationale required that it should be made to apply to moneys paid in any transaction. As the matter is one of pure Louisiana law, it would be idle to inquire whether such an action would not lie as well in the other states. But it may be confidently asserted that no system of law can be logical, adequate, and complete without such an action in such a case as this. If there be jurisdictions where a lacuna in the law exists in this respect, the reproach cannot be applied to the Louisiana law, which has provided the remedy as old as the Roman law.

It has been argued, as I have understood the contention, that the plaintiff's proper action was an action for damages or an action quanti minoris. It might be conceded that the plaintiff could have availed itself of either of these two actions, had it believed that, under the facts of its case, either of them would have been adequate. The plaintiff might not have recovered in an action for damages. It might not have recovered in an action quanti minoris, in which the issue would have been the worth, and not the cost, of the cements. But I am aware of no reason, whether formulated into law or not, why the defendant, who enriched itself at the expense of the plaintiff by substituting for the cement which it had bound itself to supply another and a cheaper cement, should be allowed to withhold a profit which it made by violating its contract. A

contractor who agrees to build a house for an employer under specifications clearly designating the materials, who substitutes other and cheaper materials and is paid the full price of the contract because the employer believes that it has been faithfully carried out, will not be allowed to answer the employer, when he demands the return of the profit, by saying:

"It may be that I have made a profit to which I have no right under the contract; but you cannot recover it back from me unless you show either that you have been damaged, or else that the materials are not as good as those which I agreed to supply and for which you have paid me."

Circumstances might easily be conceived under which neither damages nor a difference in the worth of the materials could be proven in such a case. Yet the law would be impotent and infirm if a recovery could not be allowed, based on the amount of the wrongful profit. On similar lines, an agent who is instructed to buy an article of a certain quality, and who is given the money to pay for it, cannot, when he has bought a cheaper article of another quality, refuse to return the difference in price on the plea that the two articles were of the same worth.

Plainly the main, if not the only, purpose of the contractors in obtaining from the engineer the permission to substitute one cement for the other, was to make a profit which they could not have made under their contract. If it were true that the Steel was as good as the Portland cement, it would be difficult to understand why the importation of the much costlier Portland cement has continued; and the engineers who prepared or approved the specifications would be liable to blame if they had provided for a costly cement when a much cheaper one, equally good, could have been had. But I am convinced that they do not deserve such blame. Public policy will not permit the contractors of such a work as the one in question, affecting the health of a large city, to violate their contract by substituting their judgment concerning one of the most important materials of the work to that of the public body with which they contracted. And when they supply a cheaper and different material, instead of the material contracted for, and thereby make a large profit, they will not be heard to say, when sued for the return of the profit, that the cheaper material was as good as the other. They will not be allowed to profit from their violation of the contract. No injury can be done a defendant in such a case as the instant one. He is not asked, as he would be in a suit for damages, to satisfy out of his own property the injury done to the plaintiff. He is merely asked to return money which does not belong to him, and which belongs to the plaintiff. It seems to me that all the equities of this cause are with the plaintiff. Surely, the defendant was not injured or placed in a less advantageous position by the substitution made at its own request. On the contrary, it was largely benefited. It was certainly not misled in any way. Obviously it knew, by the mere reading of the contract, that the engineer had no right to allow the substitution. If the de-

fendant was relying on the assent of the commission—assuming that body to have had the right to give such assent—it was incumbent upon the defendant to ascertain that the assent had been given, and that the commission had the right to give it.   In dealing with the engineer or with the commission, the defendant had no right to presume that they were acting within the line of their duty, but it was required to take care to learn the nature and extent of their authority.   McDonald v. Mayor, etc., of New York City, 68 N. Y. 23, 23 Am. Rep. 144; Parr v. Village of Greenbush, 72 N. Y., at page 472; and other cases.   The defendant's cause, in my opinion, is entirely naked of equities.

It is clear to me that the plaintiff was not limited to an action for damages or to an action for reduction of price.   With regard to the latter action, it may be said incidentally—though under my views of this case the matter is of no importance—that it is doubtful whether such an action would lie in a case like the instant one.   The provisions concerning that action are found in the Louisiana Civil Code, under the title "Of Sale," art. 2520 (2496) et seq., with regard to animals and other movables; also under the title "Of Lease," art. 2697 (2667), with regard to the reduction of the rental where the leased house is partially destroyed.   Those articles of the Code are intended to do justice in the cases for which they provide.   They would certainly not do justice in this case. But I repeat that it is immaterial whether the plaintiff could or could not have brought the action quanti minoris.   It certainly could bring this suit.   It is true that the action condictio indebiti cannot be brought to recover money unless it "be not due in any manner, either civilly or naturally."   Civ. Code La. art. 2303 (2281). But this matter involves the right and authority of the engineer to allow the substitution of the cement, and that question will be considered hereafter.   Evidently, if the engineer had the right and authority to do what he did, then the payment was binding on the plaintiff, and it would be defeated on the merits of this action.   But this would not show that the plaintiff had no right to bring an action condictio indebiti.   It was argued, in an attempt to show that the plaintiff's remedy was an action quanti minoris, that no action condictio indebiti lies for part of a sum of money paid in error.   The French commentators on the Code Napoleon show that such a contention is, as it plainly and logically must be, entirely without foundation.   Larombière, one of the highest authorities on obligations, treating of the action condictio indebiti, says (translation):

"We pay without cause when we pay more than we owe.   We can then bring an action in repetition for the excess of the payment beyond the debt. * * *"

"We not only pay more than we owe when we pay a numerical quantity larger than that which is due, but also when we neglect to make a retention or deduction which we could have made."

Larombière, Théorie des Obligations (Paris Ed. 1857), vol. 5, p. 617, § 13.

Laurent, Droit Civil Français (Paris Ed. 1878), vol. 20, p. 371, § 348, says (translation):

"We pay what is not due when we pay more than what was due. In such a case the excess can be demanded in an action of repetition. We pay more than we owed when we have neglected to make some deduction or retention which we had a right to make."

Notice, in the Supplement to the annotated Code Napoleon of Fuzier-Herman (Paris, 1903), at page 1616, as a note to article 1377, Code Napoleon (corresponding to article 2302 [2280] of the Louisiana Civil Code), the following reference to a decision of the Court of Appeals of Ghent (Belgium) of April 11, 1885 (translation):

"An action in repetition will lie in favor of the master who has paid more than was due, when the quantities of labor and supplies provided for by the specifications have not been satisfied."

In the "Dictionnaire du Digeste," a compendium of the Pandects (Paris, 1808) vol. 1, p. 100, it is said, citing the Roman law, that, notwithstanding declarations in writing by which the parties declare themselves respectively free from all further claims regarding the matter in which the payment is made, the action condictio indebiti will lie for a thing paid in error and not due.

Larombière, Théorie des Obligations (Paris Ed. 1857) vol. 5, p. 614, § 7, says (translation):

"We pay without a cause when afterwards, notwithstanding the payment, we obtain the nullity or rescission of the pretended contract which we have executed."

This authority I shall again refer to in considering the contention that the action did not lie in the instant case because the contract was executed.

I deem a further citation of authorities on the foregoing matter unnecessary. But before passing from this point, I wish to say that this action is one clearly cognizable at law. If there were any doubt on the matter, it is plain that, as no pleading has raised the objection, it is too late, in view of the nature of this case, to consider the matter now. Union Pac. Ry. Co. v. Harris, 63 Fed., at page 803, 12 C. C. A. 598, and cases there cited; Altoona, etc., Co. v. Kittanning, etc., Ry. Co., 126 Fed., at page 561, and cases there cited; Reynes v. Dumont, 130 U. S., at page 395, 9 Sup. Ct. 486, 32 L. Ed. 934; Brown v. Lake Superior Iron Co., 134 U. S., at page 536, 10 Sup. Ct. 604, 33 L. Ed. 1021, and other cases.

There is no force in the contention that the doctrine of ultra vires militates against the plaintiff. On the trial of the exception in this cause, it was argued for the defendant, on the authority of Railway Co. v. McCarthy, 96 U. S., at page 267, 24 L. Ed. 693, and similar cases, that the plea of ultra vires will not be allowed to prevail, either for or against a corporation, if the result is to allow a legal wrong to be committed. Even if such were now the rule in the federal courts, what wrong is the plaintiff attempting to inflict? It is not seeking to withhold property or money of the defendant without compensation. On the other hand, the defendant is en-

deavoring to prevent the redress of a wrong by resisting the demand for money which in law does not belong to it and belongs to the plaintiff. But the rule invoked on the authority of the McCarthy Case and similar cases, although in no manner unfavorable to the plaintiff, is not the law in the federal courts since the decision in Central Transp. Co. v. Pullman Car Co., 139 U. S. 24, 11 Sup. Ct. 478, 35 L. Ed. 55, where, after a careful consideration of the whole matter, it was held that an ultra vires contract, whether performed or not, is void. See, also, Pullman's, etc., Co. v. Central, etc., Co., 171 U. S. 138, 18 Sup. Ct. 808, 43 L. Ed. 108. See, specially, Bank v. Kennedy, 167 U. S. 367 et seq., 17 Sup. Ct. 831, 42 L. Ed. 198, and O'Brien v. Wheelock, 184 U. S., at page 490, 22 Sup. Ct. 354, 46 L. Ed. 636. Again, even under the rule invoked on behalf of the defendant, it is well settled as an exception that, where public corporations charged with the application of public moneys make ultra vires contracts in disregard of a limitation imposed upon them by law, or in violation of public policy, the contracts are void. See Am. & Eng. Ency. Law (1st Ed.) verbis "Ultra Vires," vol. 27, at pages 375, 376, 378, and numerous cases there cited. See Parr v. Village of Greenbush, 72 N. Y. 463, especially at pages 465 and 472; City of Lancaster v. Miller (1898) 58 Ohio St. 558, especially at pages 559, 562, 571, and 575, 51 N. E. 52; McDonald v. Mayor, etc., of New York City, 68 N. Y. 23, 23 Am. Rep. 144. Notice, especially, McCloud et al. v. City of Columbus, 54 Ohio St. 439, 44 N. E. 95, and cases there cited; Dillon on Mun. Corp. (4th Ed.) § 457 et seq. It is thus seen that, on the question of ultra vires, the rule derived from the McCarthy Case, the exception to that rule, and the present rule in the federal courts are all in favor of the plaintiff, and that there is nothing in them which could in any way benefit the defendant.

There was nothing in the evidence, which, in my opinion, could have supported a finding by the jury that the commission knew of or assented to the substitution or ratified the engineer's action, and therefore I withdrew that part of the case from the jury by charging them, as matter of law, that the engineer had no right to allow the substitution. The members of the commission testified that they did not know of the substitution. It was not claimed that the engineer had informed them. There was no evidence upon which a finding by the jury that they did know would have been allowed by me to stand. I do not understand that the defendant contended on that issue that the commissioners knew of the substitution notwithstanding they testified that they did not, but that they ought to have known had they exercised a reasonable supervision of their engineer. But let it be supposed that this was true, and that the jury would have been warranted in finding from the evidence that, notwithstanding the confidence which the commission reposed in its engineer and the engineer's conceded character, the commission was guilty of negligence in not keeping watch on his acts, and in not discovering the substitution when by due diligence they could have done so; what would be the legal

effect of such a condition of things? We are told in United States
v. Bebee, 180 U. S., at page 354, 21 Sup. Ct., at page 375, 45 L. Ed.
563:

"Where an agent has acted without authority, and it is claimed that the
principal has thereafter ratified his act, such ratification can only be based
upon a full knowledge of all the facts upon which the unauthorized action was
taken. This is as true in the case of the government as in that of an in-
dividual. Knowledge is necessary in any event. Story on Agency (9th Ed.)
§ 239, notes 1 and 2. If there be want of it, *though such want arises from
the neglect of the principal* (underlining mine), no ratification can be based
upon any act of his."

Also A. & E. Enc. of Law (2d Ed.) vol. 1, p. 1190, verbo
"Agency."

Of course, ratification or consent by the commission would have
amounted to naught if it had no power or authority to assent or
ratify. But the needs of the case did not require me to determine
at the trial whether the commission had that power, and I consid-
ered it sufficient to say to the counsel, when I was stating to them,
out of the presence of the jury, the questions to which I would
confine the jury, that it was extremely doubtful, to say the least,
whether the commission itself had the power. That question was
not reached, because there was no evidence which, in my opinion,
would have warranted a finding that the commission ratified or as-
sented.

With regard to the effect of any laches, error, or neglect on
the part of the engineer or of the commission itself, it may be well
to consider briefly the nature of that public body. It seems clear
that it was created directly by the state as an instrumentality in
the exercise of one of the highest functions of sovereignty—the
police power—for the protection and enhancement of the health
of the city of New Orleans. It was so considered by the Supreme
Court of this state in the case of State v. Flower et al., 49 La. Ann.
1199, 22 South. 623. This being so, it is not to be dealt with as
an ordinary business corporation, nor as a municipal corpora-
tion in the exercise of its private and proprietary rights, as con-
tradistinguished from its public and governmental functions. It
partakes in some respects of the privileges of its creator, the state,
and it is not itself a principal, but an agent. Its principals are the
state of Louisiana and the taxpayers, as well as the whole people of
the city of New Orleans. It is well settled that neither a state nor
the United States are affected by the laches, errors, or neglects of
their officers. I do not say that this doctrine is to be applied in
its entirety to the public body with which this suit is concerned
or to the employés of that body. But it seems to me that nothing
short of the strongest equities should move a court, in such a case
as this, to charge to the people of the city of New Orleans the
laches or errors of its agents, even when occurring within the scope
of their powers.

The fact that the money was paid and the contract executed is
no obstacle in the plaintiff's way. It is manifest that no action
for money unduly paid can arise until after payment. Larombière

has told us (see supra) that the action condictio indebiti lies though the contract has been executed. The well-considered case of City of Lancaster v. Miller (cited supra) was a case in which the contract for the public work had been executed, and the suit was for a balance due on work performed. Recovery was wholly denied. The case of Parr v. Village of Greenbush (cited supra) was also a case in which a contract for public work was executed and recovery for work done denied. See 72 N. Y., especially at page 472. I deem further citation of authorities on this point unnecessary, but I will advert below to considerations bearing on this matter in passing on the question of the authority of the engineer and of the commission with regard to the substitution. Practically all the cases and authorities to which I shall refer hereafter to show the necessity of advertising contracts for public works and letting them out to the lowest bidders relate to contracts which had been fully executed and performed.

The fact that the contractors lost money by performing the work which they had bound themselves to do is wholly irrelevant to the controversy. I consider it unnecessary to say more on this point than to remark that no one is permitted to avoid a contract because he is disappointed as to the profits which he expected to make from it. The contractors cannot be allowed to repair their losses by making an undue profit on their contract.

Did the engineer have authority to allow the substitution? In passing upon this point, it should be first stated that there is nothing in the pleadings or in the evidence reflecting in any manner upon the character or integrity of the engineer, and it was fully conceded that he acted in good faith. But it is plain that his good faith could not have had the effect of conferring upon him a power or an authority which his mandate did not give him, and that his unauthorized acts, though done in good faith, could not bind or estop the commission. The fact that the contracts and specifications gave no right to the engineer to allow the substitution is so obvious to me that I do not feel that I need do more than assert the fact. I do not understand—but this is my own conclusion, not binding upon the defendant—that it was contended that the engineer had the authority as a matter of law, but that reliance was placed on a tacit assent or ratification by the commission. That matter I have already passed upon. If the engineer could allow the change of one of the most important materials of the work (possibly the most important material), by which change the defendant made a profit, as found by the jury, of more than $28,000—if the engineer could do this, what would be the limit of his authority? If the authority were conceded with regard to a matter of such importance and magnitude, I do not see how it could be denied as to any other part of the contract, or even as to the whole of it. It is true that an engineer has a reasonable discretion with regard to the carrying out of certain matters in contracts of this kind, but it is manifest that such discretion cannot be allowed to extend to the substitution of cements involved in this case. It is evident

to me that the engineer had no authority, and therefore his unauthorized acts neither bound nor estopped the commission.

Would the commission itself have had the power to allow the substitution, without at least providing for the deduction of the difference in the costs of the cements?    While, as I have already stated, the condition of the evidence in the case did not require me to determine that question, I have decided that it is better, and that it will subserve a useful purpose for me to state the conclusions which I have reached in the matter.    The drainage commission was created by the state of Louisiana by Act No. 114 of the Legislature of 1896 (Acts La. 1896, p. 162).    Its purposes were to provide for the drainage of the city of New Orleans, to provide ways, means, and funds for such drainage, and to provide for the issue and payment of bonds for the purposes of the commission, etc.

Section 5 of the act enjoins upon the commission—

"That all work done or supplies or materials ordered by said commission, of every kind and nature, except emergency work in times of extreme peril from storm or flood, shall be let by contract to the lowest responsible bidder by sealed proposals or by public auction * * * after at least thirty days' advertisement in two newspapers in the city of New Orleans, on approved specifications, one of which specifications shall always be that the contractor shall give bond with security, * * * for the faithful performance of his contract," etc.

It was also provided that if the estimated cost of the work should exceed $50,000, additional advertisement should be made in New York City and in Chicago.

Section 6 of the act provides for the issuance of bonds to an amount not exceeding $5,000,000, "in order to raise funds for the purpose of doing such work speedily and on an extensive scale." The same section also provides that "all moneys and funds dedicated and applied by this act to the purposes thereof, are consecrated to the payment of the principal and interest on said bonds."

Section 7 of the act reads:

"That all the provisions of this act respecting the dedication and application of funds and money shall constitute a contract with the holder or holders of bonds issued as aforesaid, the obligation of which contract shall not be impaired and may be enforced by any holder of said bonds by proceedings of mandamus and injunction or by other proper proceedings in court."

The mere reading of the provisions of law just mentioned cannot, it seems to me, fail to create the conviction that the commission itself could not have done what was done in the instant case.    There was a double duty as to the application of all moneys in accordance with the will of the Legislature.    There was a duty to the taxpayers and the people, and also a duty to the bondholders, who were solemnly assured that the moneys would be applied under the safeguards provided by the act.    It is perfectly plain that, if what was done in this case was permissible, those safeguards would amount to naught.    That this is so, seems to me to be a self-evident proposition.

What have the courts held as to the effect of the disregard of such a limitation as the injunction concerning advertising and

the letting to the lowest bidder, contained in the legislative act above referred to? The following cases concerned municipal corporations. But their language and the results reached in them apply with full force and effect to such a body as the commission in this case, whether or not it be considered a municipal corporation.

In City of Lancaster v. Miller (cited supra), a contractor sued for a balance claimed for work done. Recovery was wholly denied because of failure to advertise for bids as required by law. The court said, inter alia:

"The evils against which these restrictive statutes (advertising for bids, etc.) are directed are municipal extravagance and the negligence and indifference of municipal officers. They were designed for the protection of municipal taxpayers generally. * * * The mischief arising from municipal prodigality, and the growth of municipal debts that attended thereon, called loudly for an efficient remedy. These restrictive statutes are the answer to that call. They embody that principle of sound public policy which seeks to enforce economy in the administration of public affairs. The judicial tribunals of the state should administer these laws so as to advance the purpose thus sought to be accomplished. Contracts made in violation of these statutes should be held to impose no corporate liability. Persons who deal with municipal bodies for their own profit should be required at their peril to take notice of limitations upon the powers of those bodies which these statutes impose. The corporation should not be estopped by the acts of its officers to set up these statutes in defense to contracts made in disregard of them. It would be idle to enact those statutes and afterwards permit their practical abrogation by neglect or other misconduct of the officers of the municipality. If such effect should be given to such acts of municipal officers, it would defeat the operation of the statutes. The strict enforcement of these provisions may occasionally cause instances of injustice; it is possi- · ble that municipal bodies may secure benefits under a contract thus declared void and refuse to make satisfaction. In the nature of things, however, these instances will be rare. * * * If, however, cases of hardship occur, they should be attributed to the folly of him who entered into the invalid contract."

In Parr v. Village of Greenbush (cited above), a case in which the municipal corporation had received the benefits of the contract, the court said, inter alia:

"A person contracting with public officers must take notice of their powers. He is charged with knowledge of the law, and he makes a contract in viola- · tion of the law at his own risk. When the law commands public officers, before entering into contracts, to advertise and contract with the lowest bidder, a contract made without advertising and without competition is wholly illegal, and imposes no obligation upon the public body assumed to be represented. Laws of this character, imposing restraint upon public agents, have been found to be necessary and beneficial, and public policy requires that they should be rigidly enforced."

The court, answering the contention that the municipal corporation, having received the benefit of the work and materials, should at least be made to pay on a quantum meruit, said:

"If this were so, the law could always be easily evaded; that it is not so, is no longer an open question in this court"—citing cases.

In McDonald v. The Mayor, etc., of the City of New York (cited supra), the headnote, which is in consonance with the opinion, says, in part:

"Where the municipal charter prohibits its officers from contracting on its behalf for the purchase of materials, save in cases and in a manner speci-

fied, the municipality is neither liable upon a contract made by an official in violation of or without a compliance with the requirements of the charter, nor can the value of materials furnished under the contract be recovered upon any implied liability."

See Judge Colt in Worthington v. City of Boston (C. C.) 41 Fed. 23, especially at page 27, and cases there cited.

In the Am. & Eng. Ency. of Law (2d Ed.) vol. 20, p. 1165, verbis "Municipal Corporations," it is said:

"The general rule is that a provision with reference to the letting of contracts on bids is mandatory and essential to the validity of contracts entered into, in the absence of which no liability is imposed, even though fully performed by the other party thereto, and substantial benefits are conferred on the city."

See cases cited in the notes.

In Dillon on Municipal Corporations (4th Ed) § 466, it is said:

"Where the charter or incorporating act requires the officers of the city to award contracts to the lowest bidder, a contract made in violation of its requirements is illegal, and, in an action brought on such contract for the work, the city may plead its illegality in defense; and neither the municipality nor its subordinate officers can make a binding contract for such work, except in compliance with the requirements of the law."

As to the necessity of advertisement, and also specially as to the modification of the contract, see City of Memphis v. Brown, 20 Wall., at pages 320 and 321, 24 L. Ed. 924; also Bonesteel v. The Mayor, etc., of the City of New York, 22 N. Y. 162; also Hague v. Philadelphia, 48 Pa. 529, the spirit of which decision applies in this case. It is therein said:

"There was no authority in the commissioners to change the site, the terms of the contract, or the plan of execution. They had not a shadow of right to do so. To admit it, would be to strip the public of that protection which the act plainly intended to give by the restrictions it imposed, *for to alter the contract in these essential elements requires all the authority to make it,* (underlining mine) * * *. Changes in plan and specification may open a wide door to many evils, not the least of which are fraud and favoritism. All experience teaches the utter impossibility of wholly preventing unfairness and advantage taken in the execution of public contracts, even with the most vigilant watchfulness of the public interest. If, in addition, courts of justice hold that public servants can without authority bind the public for extras, even in proper and honest cases, they establish a principle which will greatly add to the demoralization of public contracts," etc.

Other cases could be cited on the point under consideration, but I deem it unnecessary to do so.

I am aware of the argument ab inconvenienti, to the effect that great embarrassment might be caused in the carrying on of public works if there were no power to modify the contracts. In the first place, I am dealing with a case in which the result of the modification was the payment to the contractors of a large sum of money which they could not have earned under their contract. I am not concerned with the effect of a modification which, by a proper adjustment, would have caused no loss to the commission. Again, assuming that the engineers who prepare the specifications for such works are competent, the instances must be very rare, to say the least, where cheaper ways and means of carrying out the

contracts are available. I am very clear that no mere argument from inconvenience, even if founded in fact, should be allowed to stand in the way of the enforcement of provisions of law enacted for the protection of those whose money is being used in the performance of public works. But this argument ab inconvenienti has no foundation in fact. For it would require no special ingenuity to make provision in the advertised specifications for changes beneficial to the work by the use of ways and means equally efficient, but cheaper than those mentioned in the contract, and this could be provided for in such way as to protect the rights of the contractors. It is plain to me how all of this could be done and yet the law be obeyed.

The only remaining point is the construction of the specifications with regard to the cement. The interpretation was for the court, except as to such part of them as presented matters of fact on which there was a conflict of evidence. The included questions of fact were for the jury. See Am. & Eng. Ency. of Law (2d Ed.) vol. 23, p. 555, verbis "Questions of Law and Fact," and cases there cited. Therefore, in the condition of the evidence, I charged the jury, as matter of law, that the cement was required to be an imported Portland cement of the best quality, and that it was also to satisfy at least the three special requirements as to tensile strength, fineness, and weight provided for by the contracts. I also charged them, as matter of law, that the words "best quality" did not mean the best quality of such cement as was then manufactured, used, or intended for any purpose, but only the best quality that was ordinarily used in 1897 in such works as these contracts provided for. McIntire v. Barnes et al., 4 Colo. 287. Subject to those charges, I left the jury entirely free to find, as matter of fact, what the parties meant by the words "best quality of Portland cement" when in 1897 they entered into the contracts. I charged the jury that they were required to make the comparison between the cost of the two cements under exactly similar conditions and circumstances, and that they were also required to give the contractors the benefit of the least cost at which, by any reasonable business method then practicable, they could have obtained the Portland cement. It was strenuously contended in this case that, by virtue of the rule that in designations and descriptions "the particular governs the general," the words "best quality" should be virtually stricken out, and that any sound imported Portland cement which would have filled the three special requirements would have satisfied the contracts. There was evidence in the case on behalf of defendant tending to show that virtually the special requirements had no force or virtue as tests of the worth of the cement. The effect of the contention, taken in connection with the evidence just referred to, would have been practically that the specifications as to the cement amounted to naught, and that no safeguard had been provided as to what might be termed the "thews and sinews" of the work. If this were true, great censure would attach to the able and distinguished engineers who prepared or approved the specifications for this great public work, involving the health and

welfare of the people of New Orleans and the expenditure of millions of dollars of public moneys. But the specifications as to the cement were neither obscure nor repugnant. They seem to have provided, both as to the "general" and the "particular," what was at that time usually provided for public works. And the fact that similar specifications might be drawn up differently today, because knowledge as to the nature and manufacture of cements has advanced since 1897, is no proof whatever that the specifications in question deserve the criticism which they have received. Doubtless, a number of experts testified in favor of the construction which was contended for, as I have just stated, and I took account of and gave weight to their opinions on that question. But, while expert engineers and expert chemists—especially such experts as testified in this case—are entitled to the greatest consideration as to any matter within their special departments of knowledge, yet, however high may be their professional attainments, they are not privileged over other men to express opinions as to the meaning of plain English. It was finally for me to determine the meaning of the specifications, leaving to the jury the question of fact included in them. It was evident to me, from the specifications themselves, that the words "best quality" were material, and could not be disregarded; and, in the light of the evidence, I believe that they constituted an essential part of the specifications. It may be said that the highest requirement for a cement—certainly for a cement to be used in such a work as the one which was contemplated—is durability. This is a quality which comes near including within itself all other qualities. It appears to me that the main, if not the only, means by which the commission could, in 1897, obtain a durable cement, and one possessing also the highly important qualification of uniformity, was to require the "best quality" of imported Portland cement—which meant a cement with a reputation and with a past of from 50 to 75 years behind it. It is manifest that it could not then have been intended to experiment with a cement which, however good it may since have proven itself to be, had not then been in existence for more than two or three years, and was then evidently in its tentative stage as to durability. After having heard the great mass of expert and scientific evidence which is in this case, I do not understand that there is to-day, even with the great advance made in the matter of cements, any tests by which the durability of a cement can be determined, and it is plain that there can be none as to uniformity. Still, there are more and better tests to-day, and useful knowledge concerning the whole matter has advanced. But a requirement as to the "best quality of Portland cement," while still highly useful to-day, was much more useful in 1897, and it is impossible for me to believe that that requirement was then considered immaterial or was intended to be waived by the special requirements. The experts who testified with regard to the rule that "the particular governs the general"—and they much outnumbered those who testified to the contrary—plainly erred in applying the rule to the facts of this case. The fundamental rule for the interpretation of contracts,

the one in which all other rules merge, is to ascertain the real meaning and the intent of the parties from every word and part of the contract. This rule is elementary, and is found, stated in almost the very words which I have just used, in a scientific work relied upon in the testimony on behalf of the defendant. It is given in that work as the first rule of construction of engineering contracts, supplemented by a fourth rule to the same effect. Engineering Contracts and Specifications, by J. E. Johnson, C. E. 1895, at page 41. The rule as to general and specific terms follows at page 42. The rule ejusdem generis, the rule exclusio unius, the rule invoked in this case that "the particular governs the general," and perhaps other rules still, are mere subordinate and auxiliary formulas intended to assist in the application of the basic rule that the intent of the parties governs. Neither in law nor in ordinary logic can there be an inflexible rule by which parties are arbitrarily held to forego a general requirement merely because they also state a particular one. If the parties had contractd for "the best quality of imported Portland cement," it is certain that the commission would have been entitled to a compliance with the requirement. How can it be said that the result of adding the special requirements was to strike out the general requirement? If a party binds himself to furnish "a first-class horse," he will be compelled to comply with his contract, subject to whatever difficulties of proof may arise in determining what is a first-class horse. If the party binds himself to furnish "a first-class horse seven years old and sixteen hands high," it is not true that any sound horse seven years old and sixteen hands high will satisfy the contract. There are cases, of course, where the court concludes, upon reading an instrument, that it was intended by the makers themselves to forego general for particular terms. Typical of such a condition of things is the case of Bock v. Perkins, 139 U. S. 628, 11 Sup. Ct. 677, 35 L. Ed. 314, as also the cases therein cited, concerning schedules annexed to instruments as parts of the same. The schedules were properly held to have been intended to limit and restrict any general terms used in the instruments. But such cases, while obviously correct, have no bearing whatever on the matter under consideration. See Am. & Eng. Enc. of Law (2d Ed.) vol. 17, pp. 6, 7, 25, and cases there cited.

The matter of the construction of the specifications seems to me to require no further consideration. It has been gone into only because of the earnestness with which it was pressed in this cause. The cases of Omaha v. Hammond, 94 U. S. 98, 24 L. Ed. 70, and District of Columbia v. Gallaher, 124 U. S. 505, 8 Sup. Ct. 585, 31 L. Ed. 526, were cited to me during the trial before the jury. They have no bearing on this controversy. It is evident that in both cases the engineers were authorized to perform the acts which were properly held to be binding on the corporations.

Being fully satisfied, after mature deliberation, that my views and action in this cause are correct, the motion for a new trial must be refused.